Albert Einstein Medical Center, Appellant, *v.* Pennsylvania Labor Relations Board, Appellee, and Professional Pharmacist Guild of Delaware Valley, Intervening Appellee.

92

Argued October 8, 1974, before President Judge BOW-MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-CER, ROGERS and BLATT. Judge KRAMER did not participate.

*William A. Whiteside, Jr.,* with him *Howard R. Flaxman, Nathan L. Posner* and, of counsel, *Fox, Rothschild, O'Brien & Frankel,* for appellant.

*James L. Crawford,* with him *James F. Wildeman, Anthony J. Molloy* and *Forest N. Myers,* for appellee.

*Anthony Molloy, Jr.,* with him *Richard B. Sigmond* and *Meranze, Katz, Spear & Wilderman,* for intervening appellee.

OPINION BY JUDGE BLATT, January 3, 1975:

This appeal follows an order of the Court of Common Pleas of Philadelphia County, entered October 15, 1973, dismissing the appeal by Albert Einstein Medical Center, Northern Division (Einstein) from the final order of the Pennsylvania Labor Relations Board (PLRB) dated October 11, 1972.

On September 28, 1971, the Professional Pharmacists Guild of Delaware Valley (Guild), the intervenors herein, filed a representation petition with the PLRB seeking certification as the exclusive bargaining representative

of full and part-time pharmacists at Einstein. On June 12, 1972 after a hearing, the PLRB ordered an election to be held among all pharmacists at Einstein. At the election, held on June 23, 1972, a majority of those allegedly eligible voted, six to five, for representation by the Guild. Einstein, however, filed exceptions, alleging that a group of pharmacists, including part-time and supervisory employes within that group, constituted an inappropriate bargaining unit. Another hearing was held and, on September 14, 1972, the Board followed with a Nisi Order of Certification, made final by order of October 11, 1972, dismissing Einstein's exceptions and thereby certifying the Guild as the exclusive bargaining representative of both full and part-time pharmacists.

Pursuant to the Public Employes Relations Act (Act 195),[1] Einstein then appealed the PLRB's final order to the Court of Common Pleas of Philadelphia County, which sustained the PLRB order. This appeal followed.

We scheduled argument for October 8, 1974 and on October 2, 1974 the Guild, as intervening appellee, moved to quash the appeal asserting that we now lack jurisdiction of this matter as a result of recent amendments to the federal Labor-Management Relations Act, 29 U.S.C. §141, et seq., signed into law July 26, 1974, and effective August 26, 1974.[2] These amendments brought non-profit

---

1 Section 1502 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563 (Act No. 195), *as amended*, 43 P.S. §1101.-1502 (Supp. 1974-1975).

2 Section 2(2) of the National Labor Relations Act, 29 U.S.C. §152(2) formerly read

"The term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, *or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual,* or any person subject to the Railway Labor Act, as amended from

hospitals, such as Einstein, within the coverage of the federal Act. Argument was held as scheduled on both the merits of the appeal and on the motion to quash.

Were it not for the amendments to the National Labor Relations Act, this Court would clearly have jurisdiction of the instant appeal pursuant to Section 402(3) of the Appellant Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, 17 P.S. §211.402(3) (Supp. 1974-1975). The Guild, however, argues that because nonprofit hospitals shall now be covered by the .National Labor Relations Act, this Court has been divested of jurisdiction pursuant to the National Labor Relations Board preemption doctrine established in *Guss v. Utah Labor Relations Board,* 353 U.S. 1 (1957) and again in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959).

Upon promulgation of the National Labor Relations Act amendments concerned in this case, the General Counsel of the National Labor Relations Board envisioned some of the transitional problems likely to occur, and, in reference to possible unfair labor practices, he stated:

> "Other cases may arise, posing factual situations where conduct occurring at previously uncovered institutions before the effective date of the legislation conflicts with established principles under the Act. One example would be a contract entered into with a minority union, conduct which would have been violative of Sections 8(a)(2) and (1) and 8(b).(1)(A). Since

---

time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization." (Emphasis added.)
and was amended, *inter alia,* by

"striking out 'or any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual,'." Public Law 93-360(a) 8, U.S. Code Cong. & Admin. News, p. 2458 (1974).

such contracts with previously uncovered institutions did not violate the Act at the time of their execution (prior to the effective date of the amendments), they are probably immune from attack after the effective date of the legislation. . . .

"Charges may also be filed concerning previously uncovered institutions where proceedings covering the matter are pending before a state agency. Each such case will have to be individually evaluated to ascertain the specific facts, the stage of any on going state proceedings, and the possible prospective effect of continuation of the state proceedings." (Footnotes omitted.) 86 LRR 371, 389, 390 (August 26, 1974).

This Court, of course, well understands the importance of the preemption doctrine in bringing about uniform national labor policy. On the other hand, however, we have found no authority to suggest the application of the doctrine to situations in which state agencies have issued final decrees prior to the effective date of amendatory provisions of any statute, absent an express command within the amending legislation itself. A principle, fundamental to United States law since 1871, establishes that the repeal or amendment of federal statutes shall not release or extinguish any liabilities having accrued under the repealed provision. Act of February 25, 1871, 16 Stat. 432, *as amended* by the Act of July 30, 1947, 61 Stat. 633, 1 U.S.C. §109 (Supp. 1974). Although in the instant case it may be said that no real liabilities have accrued, certain obligations, such as a duty to bargain, have clearly arisen out of the PLRB order designating the pharmacists as a bargaining unit. Where either judicial review of a final order has begun, or where an action to enforce accrued obligations remains undetermined on the date when nullifying amendments to the statute under which those obligations arose became effective, then those actions shall survive the amendments and the obligations may be enforced, unless such amendments expressly pro-

vide otherwise. *Cf. National Labor Relations Board v. National Garment Co.,* 166 F.2d 233 (8th Cir. 1948), *cert. denied,* 334 U.S. 845 (1948).

The Guild's representation petition was filed in this case in September of 1971 and the order by the PLRB certifying the Guild as the bargaining representative was made final in October of 1972, nearly two years prior to the federal amendments. The PLRB's order was sustained by the lower court at least ten months prior to the effective date of these amendments. In fact, the action was so far along in the review process prior to the effective date of the amendments which will henceforth divest the state of its jurisdiction in these cases that the National Labor Relations Board preemption clearly does not apply here.

We must, therefore, consider the appeal and review the findings of the PLRB to determine whether or not they are supported by substantial and legally credible evidence and whether or not the conclusions deduced therefrom are reasonable and not capricious, arbitrary, or illegal. *Canon-McMillan School Board v. Pennsylvania Labor Relations Board,* 12 Pa. Commonwealth Ct. 323, 316 A.2d 114 (1974).

Einstein first asserted that the unit, as certified by the PLRB and consisting solely of pharmacists, will lead to the prohibited condition of an over-fragmentization of units. Section 604 of Act 195, 43 P.S. §1101.604 (Supp. 1974-1975), establishes that:

> "In determining the appropriateness of the unit, the board shall:
>
> "(1) Take into consideration but shall not be limited to the following: (i) public employees must have an identifiable community of interest, and (ii) the effects of over-fragmentization."

These seemingly disparate considerations are reconciled by reference to what we believe is the intended objective of Act 195, that is, maintaining "peace in the relationship between public employers and their employees

and the reduction in the number and duration of work stoppages in vital public services". *Western Psychiatric Institute and Clinic of the University of Pittsburgh of the Commonwealth System of Higher Education v. Pennsylvania Labor Relations Board,* 16 Pa. Commonwealth Ct. 204, 330 A.2d 257 (1974).

Obviously the PLRB is placed in the unenviable position of delineating a group sufficiently narrow to ensure that the members have a community of interest but not so narrow as to constitute over-fragmentization. Its experience, of course, should enable it to weight the factors involved so as to determine the appropriateness of a proposed bargaining unit, and, as we review the record, we find substantial evidence to support the PLRB finding that the creation of a small bargaining unit with duties limited essentially to dispensing drugs will not lead to over-fragmentization.

Einstein next argues that part-time employes lack the necessary community of interest to be included within a bargaining unit of full-time employes. It is well settled, however, that part-time employes may well have a community of interest strong enough in relation to the full-time employes to warrant their inclusion in the same unit. *Indianapolis Glove Co. v. N.L.R.B.,* 400 F.2d 363 (6th Cir. 1968) ; *N.L.R.B. v. Economy Food Center, Inc.,* 333 F.2d 468 (7th Cir. 1964). Once again, this is a determination which the PLRB as an experienced administrative agency is best suited to make. And thus, by statute, our scope of review is limited. The PLRB concluded, from legally credible evidence, that part-time pharmacists perform the same function as full-time pharmacists and that they receive the same rate of pay with many similar fringe benefits. Of course, part-time employes work for fewer hours and in this case are ineligible for certain benefits, but to include part and full-time employes within the same unit is reasonably justi-

fied by the facts and constitutes neither an error of law nor an abuse of discretion by the PLRB.

Lastly, Einstein argues that including Mr. Selig Gross, the "dispensing supervisor," within the unit contravenes the statutory mandate to exclude supervisory employes from general employe units. Section 604(5) of Act 195, 43 P.S. §1101.604(5) (Supp. 1974-1975). "Supervision" is defined in that Act as:

"... any individual having authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees or responsibly to direct them or adjust their grievances; or to a substantial degree effectively recommend such action, if, in connection with the foregoing, the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment." Section 301(6) of Act 195, 43 P.S. §1101.301(6) (Supp. 1974-1975).

"In determining supervisory status the Board may take into consideration the extent to which supervisory and non-supervisory functions are performed." Section 604(5) of Act 195, 43 P.S. §1101.604(5) (Supp. 1974-1975). At the hearing before the PLRB, Einstein produced the Director of the Pharmacy who testified that Mr. Gross was a first-level supervisor in fact as well as in title. Considering his testimony, however, along with the job description introduced, the Board determined that Mr. Gross had no authority to hire or fire personnel and had no authority to transfer, suspend, lay off, recall, or promote other pharmacists. Nor did Einstein produce evidence that Mr. Gross had authority to assign, reward or discipline other employes, or to adjust their grievances. The Director did testify that, prior to employe promotions and discharges, the opinions of Mr. Gross were elicited, but he did not testify as to the weight given those opinions. It appears that, although Mr. Gross held the title of supervisor, the PLRB found that his job characteris-

tics did not meet the statutory definition, and this finding was clearly based upon substantial evidence. The legal conclusion that Selig Gross was not a first-level supervisor was, therefore, not unreasonable, arbitrary, or illegal, and, therefore, he was properly included in the bargaining unit.

Accordingly, we must affirm the lower court, and the action of the Pennsylvania Labor Relations Board is hereby sustained.

DISSENTING OPINION BY PRESIDENT JUDGE BOWMAN

I dissent. The majority has properly characterized our scope of review in appeals involving adjudications of the Pennsylvania Labor Relations Board (PLRB) as including a determination as to whether or not the conclusions reached by the PLRB are reasonable and not capricious, arbitrary, or illegal. It follows therefrom that an improper application of the relevant law by the PLRB will allow this Court to reverse the result reached by the PLRB.

In order to maintain paramount the "right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare," §101 of the Public Employe Relations Act, Act of July 23, 1970, P. L. 563, 43 P. S. §1101.101 (Supp. 1974-1975), the General Assembly has imposed certain limitations on the rights to organize given public employes under the Act. The most important of these limitations are those requiring the PLRB to determine the "appropriateness" of the proposed bargaining unit and, in so doing, to give consideration to the finding of an "identifiable community of interest" among the potential members of such unit and to the possibility of the "over-fragmentization" of the units which must bargain with a particular employer. 43 P. S. §1101.604. While the language of §604 appears to give coequal status to these two factors, as well as to other unenumerated considerations, the PLRB, despite

its alleged "weighing" and/or "balancing" of these factors, has placed much the greater emphasis upon the "identifiable community of interest." Obviously, a balancing of these considerations is required. There does exist an apparent conflict between them. However, it is equally obvious that the PLRB has failed to achieve a true balancing of the weight to be given each. The PLRB has so narrowly construed "identifiable community of interest" as to require a virtual identity of functions and interests among all of the potential members of the proposed bargaining unit. While it may be desirable to so restrict the membership of such unit, this cannot be done without giving due consideration to the potential for disorder inherent in a system wherein the employer is forced to bargain with a multitude of such units. The existence of many small, homogeneous units presents a tremendous obstacle to the promotion of "orderly and constructive relationships between all public employers and their employes" (43 P. S. §1101.101) and, ultimately, to the protection of the welfare of the citizenry. A true balancing of the two aforementioned factors would be more productive of harmony in the arena of collective bargaining, even at the sacrifice of complete homogeneity within each bargaining unit. In this case, there can be no question but that, by its approval of an eleven-member bargaining unit within a system employing hundreds, the PLRB has acted in complete disregard of the aforesaid principles. The one-sided approach taken by the PLRB is clearly a misapplication of §604, and its conclusions derived therefrom are thus unreasonable under the law.

For the reasons set forth above, I would reverse the order of the Court of Common Pleas of Philadelphia County, which order affirmed the conclusions of the PLRB as to the appropriateness of the proposed bargaining unit.

Judge CRUMLISH, JR., joins in this dissent.

DISSENTING OPINION BY JUDGE CRUMLISH, JR.

I must respectfully dissent. I would hold that the recent amendments to Section 2(2) of the National Labor Relations Act, 29 U.S.C. §152(2), *as amended,* by Public Law 93-360(a)8, U.S. Cong. & Admin. News 444 (1974), effectively preempted the jurisdiction of the Pennsylvania Labor Relations Board (PLRB) to determine the appropriate collective bargaining unit of employees of non-profit hospitals such as Einstein Northern, and this Court lacks the power to review on substantive grounds that determination. *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767 (1947); *Pittsburgh Railways Company Substation Operators and Maintenance Employees' Case,* 357 Pa. 379, 54 A.2d 891 (1947). "The clear implication of the decision of the Supreme Court of the United States in Bethlehem Steel Co., et al. v. New York State Labor Relations Board, supra, is that whenever the employer-employee relationship is one over which Congress has the power of regulation and with regard to which Congress has acted, state power is suspended and cannot constitutionally be exercised. To permit the exercise of state power in such circumstances would effectively negative the supremacy of Congressional legislation." *Pittsburgh Railways Company Substation Operators and Maintenance Employees' Case,* 357 Pa. at 386, 54 A. 2d at 895.

Although the PLRB asserted jurisdiction over Einstein Northern well before the effective date of the federal amendments, I cannot comprehend what real liabilities or obligations would be affected by quashing the state certification proceedings. Interestingly, it is not Einstein Northern but the Professional Pharmacists Guild of Delaware Valley (Guild) which presses for preemption, though it is the Guild which arguably benefits from the outstanding certification order. Were we dealing with unfair labor practices occurring and administratively adjudicated prior to the inclusion of non-

profit hospitals within the jurisdiction of the National Labor Relations Board, I could find some justification in transitional jurisdiction. But our affirmance of the PLRB's certification order does not give that agency any further power to enforce its order. Should Einstein Northern hereafter refuse to bargain collectively with the Guild, would the PLRB have the power to cite it for an unfair labor practice under Section 1201(a)(5) of the Public Employes Relations Act, Act of July 23, 1970, P. L. 563 (Act No. 195), *as amended,* 43 P. S. §1101.1201 (a)(5) (Supp. 1974-1975)? Would a state court have the power to enforce a PLRB order finding an unfair labor practice in light of the explicit federal preemption? *Pennsylvania Labor Relations Board v. Frank,* 362 Pa. 537, 67 A. 2d 78 (1949) answers these questions in the negative. I believe a continuation of the state proceedings to be an exercise in futility and counterproductive of a speedy resolution of the collective bargaining rights of the employees here involved and the right of Einstein Northern to bargain only with an appropriate unit.

Although I consider it inappropriate for this Court to consider the merits of this appeal for the reasons stated above, I feel constrained to reiterate my admonition of the dangers of overfragmentization, especially in hospitals such as Einstein Northern and other related health institutions. See my concurring opinion in *Western Psychiatric Institute and Clinic of the University of Pittsburgh of the Commonwealth System of Higher Education v. Pennsylvania Labor Relations Board,* 16 Pa. Commonwealth Ct. 275, 330 A. 2d 262 (1974). Such dangers include a total disruption and even discontinuance of vital health services by an employee unit small in number but critical to the operation of a functionally integrated medical team. Moreover, there exists the threat of stalements in bargaining and inter-unit confrontation brought about by the inability of an employer to gauge the bargaining demands or

fiscal result of a byzantine patchwork of employe units. I say this because I believe that when units are too narrowly drawn, the bargaining process with the employer often becomes over-complex. Similar units seeking similar demands offer their respective proposals at disparate times which compel the employer and the work force to divert their energies from the work at hand to repetitive bargaining.

A consideration which also should not be overlooked is the situation whereby units, which might have been consolidated, squabble among themselves when one is given a benefit by the employer which the other did not receive. Both of these hypothetical situations ard others contemplated but not delineated here, are the result of overfragmentization and should be avoided if the objective of Act No. 195, to maintain "peace in the relationship between public employers and their employees and the reduction in the number and duration of work stoppages in vital public services," *Western Psychiatric Institute, and Clinic of the University of the Commonwealth System of Higher Education v. Pennsylvania's Labor Relations Board,* 16 Pa. Commonwealth Ct. 204, 211, 330 A.2d 257 (1974), is to be attained.

In the present case, we have a unit of eleven pharmacists represented by the Guild. There can be no doubt that there is "an" identifiable community of interest among all pharmacists. Likewise, there is "an" identifiable community of interest among all laborers in a factory. The key word is "an" in the phrase, and it represents a question of degree and specificity in constructing the unit. It is quite possible that two individuals running the same machine, one of whom pulls a left hand lever and the other a right hand lever, could be said to have a different interest insofar as the work performed is concerned. This exaggerated example points to the potential absurdity of overspecificity in constructing a unit. Undoubtedly there are certain interests common

only to pharmacists, but in my opinion, they are not so distinguishable from those of the other professional employees in the hospital who could be included in such a unit, to warrant the sanction of a separate pharmacists' unit.