Western Psychiatric Institute and Clinic of the University of Pittsburgh of the Commonwealth System of Higher Education, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Labor Relations Board, Appellee (First case).

Argued September 5, 1974, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT. Judge KRAMER did not participate.

*James Q. Harty*, with him *John T. Tierney, III, Robert W. Watson, Jr.* and *Reed, Smith, Shaw & McClay*, for appellant.

*James W. Wildeman,* with him *James L. Crawford, Roger M. Simon, Anthony J. Molloy* and *Forest N. Myers,* for appellees.

OPINION BY JUDGE ROGERS, December 20, 1974:

Western Psychiatric Institute and Clinic of the University of Pittsburgh of the Commonwealth System of Higher Education (WPIC) has appealed from two orders of the Pennsylvania Labor Relations Board (Board) : the first, made January 12, 1973, which determined that a bargaining unit of WPIC's employees proposed by Local 1199P, National Union of Hospital and Nursing Home Employees, Division RWDSU, AFL-CIO (Union) was appropriate and ordering an election, and the second, made July 24, 1973, which dismissed WPIC's charges of unfair labor practices by the Union and its organizers in the election.

WPIC is a state owned mental hospital,[1] managed and operated by the University of Pittsburgh. WPIC has between 400 and 450 employees, of which about 150 are professional and the rest nonprofessional. After an organizing campaign, the Union filed its petition for Board approval of a bargaining unit of "[a]ll full time and regular part-time service and maintenance employees excluding all other employees and employees excluded under the Act." At the hearing upon this petition, the Union refined its application to a request that the bargaining unit consist of the following categories of nonprofessional employees: psychiatric aides, ward clerks, dietary employees, housekeeping workers, maintenance workers, stores clerks, research animal caretakers, research animal technicians, occupational therapy assistants, therapeutic recreation assistants, and therapeutic recreation technicians. Each of these

---

[1] WPIC's functions are to provide mental health care, to perform research into the causes and treatment of mental illnesses and to provide education in the fields of mental health.

categories of workers was included in the University of Pittsburgh's Employee Pay Plan and Index To Occupational Classes with a distinct class code number and class title and each had its own job description, with two exceptions: the category of ward clerk is not distinguished on the Plan and Index from the position of clerk generally and has no job description as such, and the position of therapeutic recreation technician has no job description. With respect to the exceptions, we note in the testimony that the term "ward clerk" is used in practice at the hospital to describe a person stationed at the nurse's station on the wards who maintains patients' files and records as they are there developed and who performs little, if any, typewriting; and that the therapeutic recreation technician performs substantially the same duties as are described for the position of therapeutic recreation assistant.

About 150 of the total of 250 to 300 nonprofessional employees would be included in the bargaining unit proposed by the Union. Before the Board and in this court, WPIC contends that the unit proposed is unlawful and that the only proper organizations would be either one unit of all its employees, if a majority of the professionals vote to be included in such a unit or, in the alternative, two units, one consisting of all nonprofessionals and the other of all professionals.

Section 604 of the Public Employe Relations Act (PERA), Act of July 23, 1970, P. L. 563, 43 P.S. §1101.604 (Supp. 1974-1975) reads, pertinently:

"*The board* shall determine the appropriateness of a unit which shall be the public employer unit or *a subdivision thereof.* In determining the appropriateness of the unit, the board shall:

"(1) *Take into consideration* but shall not be limited to the following: (i) public employes must have an *identifiable community of interest,* and (ii) *the effects of over-fragmentization.*

"(2) Not decide that any unit is appropriate if such suit includes both professional and nonprofessional employes, unless a majority of such professional employes vote for inclusion in such unit." (Emphasis supplied.)

WPIC's argument for a so-called wall-to-wall unit is based on its team approach to providing mental health care, described as a continuum of care commencing in the community with first contact with a community worker and proceeding through institutional inpatient or outpatient treatment, hopefully amelioration or cure, followed by return to the community under continued observation of the community worker. The team, it posits, consists of nurses, social workers, social work associates, community workers, senior secretaries and, by implication, the human resources of the hospital from medical doctors to service and maintenance employees. As progressive and effective as such a concept of the WPIC's mission doubtless is, we believe it cannot have controlling effect in a labor case. Indeed, the evidence indicates that many of WPIC's patients are not found in the community and thereafter ministered to by a team, but rather present themselves to the facility for such help as it can render. The record further reveals that large categories of nonprofessional employees are instructed to avoid contacts with patients in an effort to maintain tranquillity. We are not persuaded that the team approach as described either establishes an identifiable community of interest among all of WPIC's employees or that the effectiveness of its team approach would be destroyed by the approval of the unit here proposed. Indeed, WPIC's specific listing of positions included in the team effort does not include most of the categories of workers included in the proposed bargaining unit. Without intending in any way to disparage WPIC's view of the best means of accomplishing its mission, we have difficulty in accepting the

claim that ward clerks, kitchen and laundry workers, psychiatric aides (the name given to attendants to mentally ill patients), custodians and maintenance personnel have, or would think they have, an identifiable community of interest with doctors and nurses simply because the administration sees them as parts of a great team providing help to the mentally and emotionally ill.

WPIC also contends that the record does not contain substantial evidence that all of the nonprofessionals included in the unit approved have an identifiable community of interest. The Board's findings in this regard were: that the educational requirements for all employees of the proposed unit were similar, ranging from completion of the 8th to 12th grade; that their pay scales were clustered at a level generally consistent with these educational requirements; that generally no special skills are required as a prerequisite to hiring; that no specialized training is afforded after hiring; that the jobs involved are essentially manual and require no particular technical skills or independent exercise of judgment; and that the employees in question are not required to deal with the public to any extent. We have read the record very carefully and have concluded that the Board's findings viewed in the light of the qualifying word "generally," which the Board itself used, are founded on the record. It is true that some of the categories of workers, such as psychiatric aides, receive some instruction at the hospital in basic psychiatry; that some exercise of judgment by some employees is allowed; that some positions, such as occupational or recreational assistants, require some prior experience or education; and that some excluded positions have no higher educational requirements than some included. We do not read Section 604 to mean, however, that an identifiable community of interest cannot exist without some differences in requirements of experience, skills and education, or that all positions having any charac-

teristic in common with any other must be included in a single bargaining unit. To accept the first proposition would lead to just the over-fragmentization against which WPIC inveighs so heavily and to espouse the latter would require a single unit in all cases, contrary to the statute's specific allowance for subdivisions.

WPIC has provided us a thorough brief pointing out that PERA's caution against over-fragmentization in bargaining units is not present in the Pennsylvania Labor Relations Act, Act of June 1, 1937, P. L. 1168, 43 P.S. §211.1 et seq. We may add that neither the NLRB nor the statutes of other states[2] having labor relations acts concerning public employees contain such a warning. We agree with WPIC that the Board and courts of Pennsylvania reviewing the Board's determinations may not ignore the effects of over-fragmentization and that the units must be as few as practicably can be. The authorities[3] agree that over-fragmentization in the public area is undesirable. The fundamental reason is, of course, that public employees are engaged in work contributing, if not essential, to public health, safety, convenience or prosperity—work, therefore, which should ideally never be suspended. This consideration is, of course, especially applicable in the case of hospitals.

The problem is that the Board, and we, have a difficult statute to work with. The bargaining unit must include employees with an identifiable community of

[2] 19 Mass. Gen. Laws, ch. 149, §178F(3) ; Mich. Comp. Laws, §423.213 ; 3 Wisc. Stat. §111.81.

[3] Including The Report and Recommendations of the Governor's Commission to Revise the Public Employee Law of Pennsylvania (the Hickman Report) which resulted in the drafting of PERA and Shaw and Clark, "Determination of Appropriate Bargaining Units in the Public Sector ; Legal and Practical Problems," 51 Oreg. L. Rev. 151 (1971) ; Edwards, "The Developing Labor Relations Law in the Public Sector," 10 Duquesne U. L. Rev. 357 (1972) ; Rock, "The Appropriate Unit Question in the Public Service ; The Problem of Proliferation," 67 Mich. L. Rev. 1001 (1969).

interest. The word identifiable connotes something more restrictive than the mere community of interest required in the private sector; it suggests more and smaller units. Yet the Act demands that the Board also consider the effects of over-fragmentization, suggesting the desirability of fewer and larger units. The reconciliation is to be achieved, we believe, by reference to the end PERA was intended to achieve—peace in the relationship between public employers and their employees and the reduction in the number and duration of work stoppages in vital public services. It was not intended, as we are frequently told in this type of case, to afford public employees the right to strike. On the contrary, the interest principally to be served is that of the public, meaning those persons who require the services provided by public agencies. We so held in *Pennsylvania Labor Relations Board v. State College Area School District*, 9 Pa. Commonwealth Ct. 229, 306 A. 2d 404 (1973).

Did the Board in approving this unit of 150 of WPIC's 250 to 300 nonprofessional employees properly attend the facts and conform to the Act? It found that the members of the proposed unit had an identifiable community of interest and it considered, in the sense that it discussed, the subject of over-fragmentization. We are limited in our review as to a determination of whether the findings of the Board are supported by substantial and legally credible evidence and whether its conclusions based on the facts are reasonable and not capricious, arbitrary or illegal. *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.*, 345 Pa. 398, 29 A. 2d 90 (1942) ; *Pennsylvania Labor Relations Board v. State College Area School District, supra.* Further, the Board, as other such administrative agencies, is considered to be experienced and to possess expertise in the subject committed to its adminis-

tration and therefore to be better qualified than this or other courts of law to weigh the facts and to appreciate the complexities of the subject of labor relations, including the appropriateness of a proposed bargaining unit. *Pennsylvania Labor Relations Board v. Sand's Restaurant Corporation,* 429 Pa. 479, 240 A. 2d 801 (1968); *Pennsylvania Labor Relations Board v. Butz,* 411 Pa. 360, 192 A. 2d 707 (1963). We cannot state, on this record so reviewed, that the evidence in support of the Board's finding that this unit was appropriate, was not substantially or legally credible, or that its conclusions were capricious, arbitrary or unreasonable. We hasten to add that the Legislature's requirement that the dangerous effects of over-fragmentization be considered by the Board is of the utmost importance; it certainly means that the Board shall not casually approve one unit after another in a public hospital merely because the petitioning labor organization is able to gain the allegiance of some employees having an identifiable community of interest. Since we cannot conclude that the Board so acted in this matter, we will affirm the Board's order made January 12, 1973 approving the unit and ordering an election.

We are, however, required to reverse and set aside the Board's order of July 24, 1973 dismissing WPIC's charges of unfair labor practices in the election. The election was conducted March 2, 1973. The ballots were cast in a room on the second floor of WPIC's hospital and clinic at 3811 O'Hara Street, Pittsburgh. Of the 121 ballots cast, 67 were cast for the Union and 54 were cast for no representative. Prior to the election, WPIC and the Union entered into a written agreement which included the term: "[t]hat the cut-off date for electioneering shall be at 12:01 midnight, on the day of election, to wit, March 2, 1973." This provision was incorporated in the Board's Order and Notice of Election.

During the election on March 2, 1973, Union representatives posted themselves at curbside near the hospital's main entrance, urged one voter to "vote union" and conversed with other voters as they arrived for work and to vote. In addition, a Union organizer was seen in the building wearing a campaign button. The Union, significantly, offered no evidence at this hearing.

The Board dismissed the charges on the authority of one of its cases defining the polling area and made no mention of the agreement of the parties or of its order prohibiting all electioneering on the day of election. The activities described were clearly electioneering and equally clearly violative of the Board's order. They constituted an unfair practice, by Section 1201(b)(4) of the Act, *as amended,* 43 P.S. §1101.1201(b)(4).

The Union cites Section 605(6), *as amended,* 43 P.S. §1101.605(6), providing that the Board shall certify election results in the presence of an unfair practice if it finds that the offending conduct did not affect the outcome of the election in support of the contention that, even if the Union did engage in unfair practices, there was no showing that its conduct affected the outcome of the election. Our reading of Section 605(6) compels the conclusion that if, as here, an unfair practice is proved, the guilty party thereupon has the burden to prove that its conduct had no effect on the outcome of the election, not that the innocent party must prove not only the offense but also that the outcome of the election was thereby affected. The unfair practice was amply proved in this case and the Union not only failed to deny or explain its actions but offered nothing to prove that its forbidden electioneering did not affect the result, as it obviously was intended to do.

In the interest of completeness we state our conclusion that WPIC's charges of unfair preelection practices were without merit.

214

The Board's order to its number PERA-R-2281-W, made January 12, 1973, is affirmed and WPIC's appeal dismissed.

WPIC's appeal from the Board's order to Board number PERA-C-3285-W, made July 24, 1973, is sustained, said order is set aside and the matter remanded for the conduct of a new election.