Philadelphia Federation of Teachers, Local No. 3 et al., Appellants *v.* Arthur W. Thomas et al., Appellees.

Philadelphia Federation of Teachers, Local No. 3, AFT, AFL-CIO, Appellant *v.* Board of Education of the School District of Philadelphia, et al., Appellees.

Argued October 19, 1981, before President Judge CRUMLISH and Judges ROGERS and WILLIAMS, JR., sitting as a panel of three.

*James J. Binns,* for appellants.

*Eugene F. Brazil,* General Counsel, and *Vincent J. Salandria,* Assistant General Counsel, for appellees.

*H. Francis DéLone,* with him, *Jerome A. Hoffman, and Alan D. Berkowitz, Dechert, Price & Rhoads,* for Amicus Curiae, Greater Philadelphia Partnership.

OPINION BY PRESIDENT JUDGE CRUMLISH, October 27, 1981:

Before us are two appeals by the Philadelphia Federation of Teachers (PFT) from two Philadelphia County Common Pleas Court decisions which: (1) granted injunctive relief sought by the Board of Education of the School District of Philadelphia (Board) and ordered the PFT back to work effective October 12, 1981, and (2) denied the PFT's request to enjoin the Board from violating the provisions of the collective bargaining agreement (Agreement). We modify and affirm in No. 2484 C.D. 1981. We affirm

in No. 2537 C.D. 1981 for the reasons expressed in this opinion.

At the outset, so that no one is mistaken, this Court is aware of the interlocking, conflicting legal concepts to which counsel has adroitly sculpted the factual situation to further their client's cause, but as in all labor disputes, whether in the public or the private sector, the fallout usually affects innocent third parties, the school children of Philadelphia. There can be no greater demand made upon these litigants and upon this Court than to address and resolve their differences because the innocent are helpless hostages. Their constitutional right to a thorough and efficient education demands of us prompt, decisive and responsible action.

As an appellate court, we make decisions removed from the turbulent and emotional arena within which the parties and the lower court operated. We have the opportunity to reflect, not at a more leisurely pace, but in an environment which lends itself to a contemplative examination of this unique legal and factual controversy. This necessarily less-harried reflection produces our decision and opinion.

### History of the Controversy

In September 1980, after a 22-day strike, the Board and members of the PFT executed what was purported to be a two-year contract for the period September 1, 1980 through August 31, 1982. In May 1981, it became apparent that the 1981-82 budget could not or would not be fully funded by its customary city, state and federal sources. To comply with the provisions of the Educational Supplement to the Philadelphia Home Rule Charter, 351 Pa. Code §12.12-303(a), (see The First Class City Public Education Home Rule Act, Act of August 9, 1963, P.L. 643, as amended, 53 P.S. §13201) requiring it to operate

within a balanced budget, the Board adopted a substantially reduced budget.

In addition to reductions which directly affected the agreement, the Board eliminated after-school use of buildings for recreation and community groups, reduced alterations and improvements, reduced anticipated short-term interest expense, eliminated expansion in curriculum and instruction, reduced by 50% equipment in non-instructional areas, eliminated scholarships, eliminated expansion in executive and Board management and reduced extra-curricular activities. The proposed wage increases to all PFT members were negated and approximately 3,400 PFT members were to be eliminated from the payroll.

In an attempt to rescind the announced layoffs and force the Board to comply with the terms of the labor agreement as it saw it, PFT filed suit in the Philadelphia Common Pleas Court on May 29, 1981, seeking enforcement of the terms of the contentious agreement. On September 4, 1981, well into the budget year, and without resolution, Judge TAKIFF denied PFT's request for specific performance, holding, at that time, that the contract was viable only to the extent that the necessary funds were forthcoming. Subsequently, the Board sought an injunction ordering the teachers back to work. The lower court[1] then held that, due to the changed circumstances, the contract was terminated and that the PFT was conducting an illegal strike. That court then ordered the PFT back to work comparing it to a party whose collective bargaining agreement had expired.

Our discussion must begin by delineating the limited powers of the Board which contributed to a confusion of rights. The Education Supplement to

---

[1] The lower court's "back to work" order was entered by a two-judge panel of BRADLEY, P. J. and TAKIFF, J.

the Philadelphia Home Rule Charter, establishes a School Board, not elected by the people but rather appointed by the Mayor of the City, *see* 351 Pa. Code §12.12-201. The Board, as an appointed body, is constitutionally prohibited from raising revenues through taxation. Pa. Const. Art. III, §31; *See Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937).

Instead of being self-sufficient, the Board must look to the Federal Government, the Pennsylvania General Assembly and the City Council as revenue sources. The Charter provides for a process by which the Board calculates its annual budget, *see* 351 Pa. Code §12.12-304, submits its proposal to Council, which, after careful consideration, may approve or reject the budget request, *see* 351 Pa. Code §12.12-305. The Board is permitted to levy only the amount of taxes which the Council, in its independent legislative judgment, authorizes. This inability on the Board's part to raise revenue independently dilutes its power, as an employer, to enter into a binding contract and guarantee monetary terms to public employees. This critical difference manifests and constitutes the key to the parties' differences.

The City, not a party to the contract, stepped into this vacuum adding to the confused atmosphere of the negotiations. The record reveals a pattern of conduct, although advisory and unofficial,[2] by City officials, including the Mayor and his executive officers, in the negotiation of contracts between the Board and the Federation since at least 1972.[3]

---

[2] In *Philadelphia Federation of Teachers v. Board of Education* (No. 1989 C.D. 1981, filed October 12, 1981), we affirmed the lower court's dismissal of the City officials as defendants in the PFT's suit to enforce the alleged 1980-82 contract.

[3] In fact, the Board stipulated that the City Administration involved itself in the 1972, 1976, 1978 and 1980 contract negotia-

The record is replete with examples of City involvement in the bargaining process. Specifically, the City assured the parties that it would pursue at least four avenues of funding: 1) refinancing the School District's long-term debt; 2) pressing the state to fully fund the general subsidy program; 3) provide leadership in obtaining Federal revenues and 4) seeking further appropriations from City Council.[4] The City also strongly recommended that the parties amend the proposed job security clause since the language of the provision would substantially hamper the City's efforts to secure funding from financial institutions.

The long history of City participation coupled with the City's specific input into the negotiations with no actual or apparent authority to affect the signatories' obligations, added an additional dimension to Philadelphia public education law, a dimension never heretofore resolved by traditional public labor law and contract principles.

A third factor that led to the existing confusion and turmoil is the Public Employe Relations Act's, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §1101.101 (PERA), yet unresolved relationship to the Educational Supplement to the Home Rule Charter, 351 Pa. Code §12.12-303(a) (mandating that the Board operate within a balanced budget), our Pennsylvania Supreme Court's rulings in *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360 (1979) (the appointed Board may not constitutionally raise revenues), our

---

tions. James R. Melinson, the Board's Chief Negotiator, testified that it was traditional to involve the City administrator in the negotiations, especially in impasse situations.

[4] We are careful to note that the City never guaranteed or promised that the proposed agreement would be fully funded; neither the City nor its officials incurred any contractual obligation or liability.

holding in *Commonwealth v. Harambee, Inc.*, 21 Pa. Commonwealth Ct. 430, 346 A.2d 594 (1975) (ruling against the enforceability of public contracts absent sufficient enabling legislation), and Section 901 of PERA which dictates that "[a]ny provisions of the contract requiring legislative action will only be effective if such legislation is enacted." 43 P.S. §1101.901.

Out of this chaos, the parties reach conflicting conclusions as to the status of the contract and the legality of the strike. The Board alleges that the strike is illegal under any circumstances, i.e., whether there exists a contract or not. Assuming that a contract exists and it is enforceable, the Board contends that the no-strike clause of the agreement makes such a strike illegal. In the alternative, the Board says PERA prohibits this strike.

PFT, on the other hand, asserts that the strike under any circumstances is a legal one. If there is a contract, they contend, the unilateral breach by the Board left it with only one alternative: strike. If the contract is unenforceable, then the strike is legal, for PFT has met the bargaining provisions of PERA.

## DISCUSSION

A searching comparison of both opinions of the lower court, one involving a complaint in equity seeking to enjoin the School Board from violating any provision of the collective bargaining agreement, the other involving a request for injunctive relief against the strike by the PFT, leads us to conclude that these opinions are at the least confusing, and at the most conflicting.

In the suit by the PFT seeking to enforce the collective bargaining agreement the court held that the contract was subject to the condition precedent that sufficient appropriation or tax authorization

would be forthcoming from a legislative body. Upon the non-occurrence of this condition the court apparently concluded that the Board's duties were discharged only to the extent that funding was available. "[T]he performance of the School Board that is discharged is limited to the performance that was dependent upon the full availability of funding required to discharge its undertakings." *Philadelphia Federation of Teachers v. Board of Education of the School District of Philadelphia, et al.,* (No. 4369 May Term 1981, filed September 4, 1981) Slip Op. at 30. The court further reasoned that the budgetary shortfall did not render *all* performance by the Board impossible.

This reasoning leads us to conclude that the lower court considers the provisions of the second year of the contract in effect to the extent that they are funded.

In a later opinion ordering the PFT back to work, holding that they were participating in an illegal strike, the lower court discussed the ramifications of the failure of the full funding of the agreement and reasoned that the changed circumstances so materially affected the agreement "that it must be deemed to be terminated." *Board of Education of the School District of Philadelphia, et al. v. Philadelphia Federation of Teachers,* (No. 1851 September Term 1981, filed October 7, 1981) Slip. Op. at 17. Adding further to the confusion, that court held that the non-occurrence of the condition of sufficient funding made the agreement impossible of performance. It concluded that this left the parties "in a position tantamount to their status following the *expiration* of a collective bargaining agreement." *Id.* (emphasis added). Thus, in effect, it decided that, due to impossibility of performance, the collective bargaining agreement had expired.

The court then ordered the parties to return to the status quo during the pendency of negotiations. But, the order is unclear as to what constitutes the status quo. ''Restoration of the parties to the status quo that existed *upon expiration* of the first year of the Agreement . . . must reflect the adjustment demanded by the somewhat extraordinary circumstances of the economic anomaly that precipitated this dispute.'' *Id.* at 18. The court has thus ordered the PFT to return to work under the terms of the agreement, as modified by the failure of funding, an agreement which in the same opinion of the court has found to be terminated because of the lack of those funds.

The consistency of this conclusion is beyond our comprehension. Moreover, we cannot reconcile it with that court's other holding that the contract is viable to the extent that funds are available. The inconsistencies and contradictions we have found in these two opinions have lent greater confusion in these extraordinary circumstances.

### APPLICATION OF THE PUBLIC EMPLOYE RELATIONS ACT

The purpose of PERA as Judge BLATT wrote in one of this Court's earlier decisions is:

> to deal with the problem of public employee relations. . . . This act explicitly recognized the right of public employees to organize and to bargain collectively, and it also established specific procedures for collective bargaining which were intended to lessen the possibility of the development of an impasse. The Act provided however, that if all the procedures have been complied with, and yet an impasse has developed, the right of the employees to strike must be recognized. The public em-

ployer is then given the right to seek equitable relief, including injunctions. . . .

*Armstrong School District v. Armstrong Education Assoc.*, 5 Pa. Commonwealth Ct. 378, 382-83, 291 A.2d 120, 123 (1972).

It is critical to recognize that PERA "is dealing in the public sector of labor relations and . . . is intended to afford public employes a limited right of collective bargaining with public employers, subject, however, to the paramount rights of the public at large." *Pennsylvania Labor Relations Board v. State College Area School District*, 9 Pa. Commonwealth Ct. 229, 236, 306 A.2d 404, 409 (1973), *remanded on other grounds*, 461 Pa. 494, 337 A.2d 262 (1975). In *Western Psychiatric Institute v. Pennsylvania Labor Relations Board*, 16 Pa. Commonwealth Ct. 204, 330 A.2d 257 (1974), Judge ROGERS recognized the difficulty experienced in trying to apply PERA to the unusual and sensitive situations that arise under it. However, Judge ROGERS astutely observed that through the haze, conflicting parties with seemingly unreconcilable differences, supported by fragmented statutes and case law there remains one guiding principle—reconciliation.

[R]econciliation is to be achieved, we believe, by reference to the end PERA was intended to achieve—peace in the relationship between public employers and their employees and the reduction in the number and duration of work stoppages in vital public services. It was not intended, as we are frequently told in this type of case, to afford public employees the right to strike. On the contrary, the interest principally to be served is that of the public, meaning those persons who require the services provided by public agencies.

*Id.* at 211, 330 A.2d at 260-61.

## Conclusion

From this complex legal and factual matrix, we can only conclude that the PFT and the Board did not enter into a binding collective bargaining agreement for the 1981-82 school year.

Although believing that they had executed a binding two-year Agreement in the fall of 1980, in actuality, no such enforceable *two-year* agreement ever existed. Rather, we conclude that the agreement constituted a severable contract[5] with each year subject to a condition precedent, that is, that the funding of the contract by the independent legislative bodies over which neither party had any actual control, would be forthcoming.[6]

In 1980, the condition was fulfilled by a legislative appropriation which was adequate to fulfill the terms and conditions of the 1980-81 agreement. When the condition was met, the parties' respective duties arose, which were substantially carried out with a minimum of labor strife.

In the second year, the legislative bodies, in exercising their independent judgment, authorized insufficient revenues to fulfill the condition precedent to

---

[5] When part of a contract to be performed consists of several items and the consideration by the other party is apportioned to each item to be performed, such contract is generally severable. *Lucesco Oil Co. v. Brewer*, 66 Pa. 351 (1870). Therefore, it is the consideration to be paid and not the promised performance that determines to which class the contract belongs, *Id.* The consideration may be apportioned either expressly or by necessary implication, *Heilwood Fuel Co. v. Manor Real Estate Co.*, 405 Pa. 319, 175 A.2d 880 (1961). Here, the consideration promised by the School Board under the two-year document must be apportioned by law since each year's budgetary commitment is subject to the condition precedent that funding will be made available by the legislature.

[6] In reality, the parties entered into two one-year agreements—one for 1980-81 and a second for 1981-82.

the 1981-82 agreement. Since the condition was never fulfilled, mutual obligations never came into being and no duties were owed by either the Board or the PFT in the 1981-82 fiscal year.[7]

At the time of contracting, in fact, until this point in time, neither party, nor the lower court clearly comprehended the status of the would-be 1980-82 Agreement. Both parties, mistakenly believing the other had enforceable duties for the 1981-82 school year, set out to utilize whatever means they had available to enforce the contract. The Union instituted legal action and finally resorted to its most powerful economic weapon, the strike, while the Board, misinterpreting PERA, elicited the judiciary's aid to force the teachers to return to work.

Although we hold the injunction to have been properly issued, we are convinced that the lower court went beyond its authority in fixing the terms and conditions of employment beyond the last bilateral contract.[8] As we note in *Bethel Park School District v. Bethel Park Federation of Teachers*, 51 Pa. Commonwealth Ct. 104, 106-7, 414 A.2d 145, 147 (1980).

---

[7] Where parties enter into a contract on the assumption that some particular matter essential to its performance will be available and neither agrees to be responsible for its availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party, the particular thing ceases to be available, the contract will be dissolved and the parties excused from performing it. *Williston on Contracts*, §1937. *Cf, Texas Co. v. Hogarth Shipping Co.*, 256 U.S. 619 (1921).

[8] We disagree, however, with the lower court's contention that that status must be somehow tempered "by the somewhat extraordinary circumstances of the economic anomaly that precipitated this dispute." (slip op. at 18.) The order of the lower court, while recognizing the fiscal problems attendant to the second year of the two year contract, ordered back to work only those employees not subject to lay-off notices pursuant to the terms of the Board's austerity budget.

There is no common law equity jurisdiction in Pennsylvania and courts of equity in the Commonwealth may exercise only those equitable powers which have been specifically conferred by the legislature. Commonwealth v. Ryan, 459 Pa. 148, 327 A.2d 351 (1974). In school teacher contract disputes, we have held that the equity jurisdiction of common pleas courts is limited by Section 1003 of Act 195 and that they may only act to end a strike and cannot impose any judicial settlement on the parties. Bristol, supra, and Armstrong School District v. Armstrong Education Association (Armstrong II), 5 Pa. Commonwealth Ct. 387, 291 A.2d 125 (1972). Here, the School District contends that the Chancellor went beyond the power conferred on him and exceeded his jurisdiction by a judicially imposed back-to-work order which incorporated terms of employment never previously in effect nor subsequently agreed upon by the bargaining parties.

The Union contends that once the School District invoked the jurisdiction of the court below under Section 1003 of Act 195, the court thereafter had the power to impose any equitable relief it believed necessary to settle the dispute. The statutory basis of this argument is that language of Act 195 which empowers a Chancellor to order 'equitable relief including but not limited to appropriate injunctions.' The Union emphasizes the word 'appropriate' and contends that the language is meant to give broad latitude to a Chancellor in fashioning the fairest possible injunction.

Our reading of the clear statutory language of Act 195, coupled with judicial precedents of this Court, does not support the Union's inter-

pretation. The Chancellor here was empowered to grant only such equitable relief as was necessary to end the strike. Any further equity powers would have to come from a further statutory grant. See Armstrong II, supra. Unlike the case of Bristol, supra, where this Court upheld a Chancellor's order that 'employees shall return to duty under terms and conditions of employment contained in the last bilaterally, voluntarily assented-to contract between the parties' and that mutually agreed upon changes to the contract should be heeded by the parties, the order by the Chancellor in the instant case goes one step further by modifying the expired collective bargaining agreement to encompass the School District's last offer to the Union in negotiations. By including in the back-to-work order the terms and conditions included in the School District's last offer to the Union, the Chancellor has impermissibly imposed conditions on the parties which had not previously been in effect nor subsequently agreed to by the parties.

Under the term of PERA's Collective Bargaining Impasse provisions, 43 P.S. §§1101.801-807, the Board and the PFT must avail themselves of the services of the Pennsylvania Bureau of Mediation pursuant to Sections 801 and 802 of PERA. As of the date of this opinion and order, the Board and PFT are at an impasse, and are governed by Section 801, *see Port of Allegheny County v. Division 85, Amalgamated Transit Union*, 34 Pa. Commonwealth Ct. 71, 383 A.2d 954 (1978). Therefore, under section 1002:

> [s]trikes by public employes during the pendency of collective bargaining procedures ... are prohibited.

43 P.S. §§1101.1002.

Because of the confusion that has arisen from this unfortunate conflict, we choose to hold this strike to be illegal only from this date forward. This unusual, though not unprecedented holding, is as a driect result of the confusion generated by the conflicting lower court's opinions and the prevailing statutes.[9] *See Gilbert v. Montgomery Township Zoning Hearing Board,* 58 Pa. Commonwealth Ct. 296, 427 A.2d 776 (1981).

We conclude that neither party must bear total fault or responsibility for the District's paralysis. Taking into account the utter confusion of rights, we would be derelict in our responsibility to conclude otherwise. The Board and the PFT labored under a mistake of fact which went to the very heart of their contract—both mistakenly believed that from whatever source, the revenues necessary to fulfill the contract terms would be forthcoming. Under these circumstances, no agreement for 1981-82 could have ever come into being.

We cannot overemphasize that the public weal and the school children of this City have been considered to be an integral part of the negotiation process by *both* the legislature and this Court. It goes without saying that a solution must be fashioned if their interest is paramount. Accordingly, we order the teachers, in the best interest of the school children and all parties involved, to return to work under the terms of their 1980-81 contract, the last valid agreement between the parties.

The members of PFT and the Board are to commence the bargaining and mediation procedures of PERA that apply to an expired contract.[10]

---

[9] We emphasize that the precedential value of our opinion is necessarily limited by the unique factual and legal situation here presented.

[10] That the PFT and the Board had complied with the compulsory terms of PERA prior to the would-be 1980-1982 contract

The Board is expected to implement all terms of the last valid contract, including employment of all teachers who worked under that Agreement.[11] In this status, the parties can return to the bargaining table, to negotiate a new contract. *See, Bethel Park, supra.*

Judge ROGERS dissents in No. 2484 C.D. 1981 and joins the majority in No. 2537 C.D. 1981.

### ORDER

The decree of the Philadelphia Court of Common Pleas, No. 1851 September Term dated October 7, 1981, is affirmed and modified:

(a) The effective date of the decree is modified so that it is binding on the parties as of October 28, 1981;

(b) Those PFT members who were subject to previous layoff notices are to return to their employment by October 28, 1981, consistent with this opinion.

For reasons expressed herein, the final decree of the Philadelphia County Court of Common Pleas, No. 4369 May Term dated October 9, 1981, dismissing the PFT's complaint in equity is affirmed.

The parties shall not later than October 28, 1981, in writing, formally call in the service of the Pennsylvania Bureau of Mediation pursuant to 43 P.S. §1101.801.

---

has no bearing on the fact that the process must begin anew. We are in total agreement with the court below that the present strike is not "an extension of the one which ended in a collective bargaining agreement on September 22, 1980 . . . [Thus] [t]he parties are, therefore, in position tantamount to their status following the expiration of a collective bargaining agreement." (slip op. at 17).

[11] A return to the status quo necessarily includes any contract concessions which were made by the parties during the 1980-81 school year.

302

Any agreement reached between the parties shall be submitted to the appropriate legislative bodies with all due haste for funding subject to the legislative bodies' independent judgment.