KENSINGTON JOINT ACTION COUN-
CIL and Mary Kathy McManus, et al.

v.

Thomas PAUKEN, Individually and in
his capacity as the National Director
of ACTION, et al.

Civ. A. No. 81–4522.

United States District Court,
E. D. Pennsylvania.

Feb. 3, 1982.

Stephen F. Gold, Community Legal Serv-
ices, Inc., Philadelphia, Pa., for plaintiffs.

Peter F. Vaira, Jr., U.S. Atty., Joan K.
Garner, Asst. U.S. Atty., Philadelphia, Pa.,
Theodore M. Grossman, Dept. of Justice,
Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District
Judge.

In this case the Court reviews pursuant
to the Administrative Procedure Act, 5

U.S.C. § 551 *et seq.* the final decision of the Director of the ACTION agency which terminated the plaintiff Kensington Joint Action Council as a VISTA sponsor pursuant to 45 C.F.R. § 1208.2–6(a) for violating the provisions of 42 U.S.C. § 5044(d), a section of the Domestic Volunteer Service Act of 1973. This act provides for the Volunteers in Service to America (VISTA) program, 42 U.S.C. § 4951.[1] Based upon our review of the administrative record and the relevant statute, the Court has determined that the Director's decision must be set aside in that it is arbitrary, capricious, unsupported by substantial evidence and contrary to law.

## I. PARTIES

Plaintiff Kensington Joint Action Council (KJAC) is a non-profit corporation incorporated under the laws of the Commonwealth of Pennsylvania. It is a multi-racial community based organization which works with low-income and working poor Kensington residents to improve educational opportunities, to reduce inadequate housing and unemployment and to reduce crime.

Plaintiffs Mary Kathy McManus, Gloria Claudio, Georgette Darwin, Antonia Rivera and Shirley Sims are VISTA volunteers who were assigned to work with KJAC.

Defendant Thomas Pauken is the National Director of the federal agency, ACTION, an agency which manages social service programs including VISTA and the Peace Corps.

Defendant Eugene Pasymowski is the ACTION Director for the agency's Region III, which includes Pennsylvania. Prior to July 1981 defendant Pasymowski was an ACTION District IV Director for Eastern Pennsylvania.

Defendant Thomas Dunleavy is a VISTA/ACTION district program officer for the agency's District IV, which is comprised of the eastern half of Pennsylvania. Dunleavy is ACTION's program officer for several projects in Philadelphia, including KJAC.

## II. PROCEDURAL HISTORY

Plaintiffs Kensington Joint Action Council (KJAC) and Mary Kathy McManus filed this action on November 4, 1981 after ACTION suspended KJAC as a VISTA sponsor. Plaintiffs requested declaratory and injunctive relief as well as a temporary restraining order enjoining the defendants from refusing to enforce and implement all terms of the "Memorandum of Agreement" between KJAC and ACTION and ordering the defendants to continue to provide funds for the plaintiffs. The Court denied plaintiffs' request for a temporary restraining order on the ground that plaintiffs had failed to exhaust their administrative remedies.

Plaintiffs then requested ACTION to hold a termination hearing as provided in 45 C.F.R. § 1206.1–5 through § 1206.1–10. The Administrative hearing was expedited and the procedural irregularities preceding the hearing were waived by the parties pursuant to 45 C.F.R. § 1206.1–10. After a hearing, the hearing officer issued an opinion on December 1, 1981 in which he determined that KJAC had breached the terms of Section 404(d) of the Domestic Volunteer Service Act of 1973, 42 U.S.C. § 5044(d), and terminated all assistance provided by ACTION to KJAC. *See* 45 C.F.R. § 1206.-1–5. On December 3, 1981 the Director of ACTION affirmed the hearing officer's decision as the final administrative decision.

As a result of KJAC's initial suspension, the five VISTA volunteers who had been working for KJAC were placed on "administrative hold" on October 28, 1981 by ACTION. This status was to continue for 30 days with allowances and benefits continuing pending the location of an alternate assignment for the volunteers by transfer or by reinstatement of KJAC as a VISTA sponsor. After KJAC's termination by ACTION, the five volunteers were notified that effective December 15, 1981 they would be terminated as VISTA volunteers by ACTION in light of KJAC's termination

---

1. 42 U.S.C. § 5041 establishes in the executive branch of the government an agency known as the ACTION agency which agency is headed by a director appointed by the President.

as a sponsor and ACTION's inability to locate alternate assignments for the volunteers. *See* 45 C.F.R. § 1213.5-5. In light of the termination of the five volunteers, the complaint was amended to include all five volunteers as plaintiffs alleging that their termination by ACTION without a hearing violated their Fifth Amendment due process rights, the Domestic Volunteer Service Act, 42 U.S.C. § 4951 *et seq.*, and the contractual agreement with ACTION. The five volunteers requested a temporary, preliminary and permanent injunction restoring them as VISTAs.

On December 23, 1981, oral argument was held by the Court and the motion of the individual plaintiffs for a temporary restraining order was heard and denied. At oral argument plaintiffs asserted, in addition to their Fifth Amendment due process claims, that the defendants' interpretation and application of 42 U.S.C. § 5044(d) was arbitrary and capricious, and an abuse of discretion. In addition, plaintiffs assert that the language of 42 U.S.C. § 5044(d) is vague and unclear and violates the Fifth Amendment, and that § 5044(d) as interpreted by the defendant is overbroad under the First Amendment.

## III. STATUTORY BACKGROUND

Under the Domestic Volunteer Service Act of 1973, 42 U.S.C. § 4951 *et seq.*, the federal ACTION agency is authorized to administer the Volunteers in Service to America program (VISTA) for the purpose of

> ... strengthen[ing] and supplement[ing] efforts to eliminate poverty and poverty related human, social, and environmental problems in the United States by encouraging and enabling persons from all walks of life and all age groups, including elderly and retired Americans, to perform meaningful and constructive volunteer service in agencies, institutions, and situations which the application of human talent and dedication may assist in the solution of poverty and poverty-related problems and secure and exploit opportunities for self-advancement by persons af-

flicted with such problems. 42 U.S.C. § 4951.

Volunteers in the VISTA program are required to make a full time personal commitment to "combating poverty and poverty related human, social, and environmental problems" and, to the maximum extent practicable, "to live among and at the economic level of the people served, and to remain available for service without regard for regular working hours ..." 42 U.S.C. § 4954.

During their period of enrollment, VISTA volunteers are assigned to work under the direct supervision of federal, state, local agencies, or non-profit organizations that have requested assignment of VISTA volunteers. 42 U.S.C. § 4953.

An organization which wants to become a recipient of VISTA volunteers submits a VISTA project application to a District and Regional ACTION office, and, if the application is approved, the organization and the ACTION Regional Director enter into a "Memorandum of Agreement" setting forth the duties and responsibilities of ACTION and the sponsoring organization for the period set forth in the agreement.

## IV. THE UNCONTESTED EVIDENCE IN THE ADMINISTRATIVE RECORDS

The uncontested evidence contained in the administrative record reveals the following sequence of events precipitating KJAC's termination as a VISTA sponsor:

On February 16, 1981 KJAC and ACTION entered into a Memorandum of Agreement which became effective on April 1, 1981 and which was to terminate by its terms on April 1, 1982. Under the terms of the agreement, ACTION, among other things, was to assign up to five VISTA volunteers to work on a project sponsored by KJAC. For its part, KJAC, among other things, was "to the maximum extent practicable, [to] consult with and [to] utilize the people of the community to be served by Volunteers in planning, developing and implementing the project ..." and to

Comply with federal laws and regulations and ACTION policies and procedures applicable to the project, or which may become applicable to it subsequent to the execution of this Agreement. Currently applicable laws, regulations, policies and procedures are summarized in the VISTA Operations Handbook for Sponsors; however, the Handbook is not a substitute for the laws, regulations, policies and procedures themselves which are binding on sponsors, and may be obtained from any Regional office.

KJAC's Project Narrative, which was approved by VISTA, sets forth the goals and objectives of the KJAC project. Among the goals and objectives were:

to involve individual and organizational members and as many residents as possible in a direct action campaign designed to upgrade the quality of education in our School District . . .

\* \* \* \* \* \*

to carry out campaigns in each issue area that will: a. upgrade education . . .

\* \* \* \* \* \*

through a series of 5 actions, meetings, conferences with decision makers in each issue area accomplish the following:

—increase by 25% funding for book purchases to alleviate book shortages in the School District.

In addition, the VISTA Volunteer Workplan for KJAC, approved by VISTA, provided that KJAC volunteers would, among other things, work:

to increase parent involvement in the public-schools in our School District.

to upgrade the quality of education of the schools in our District.

to involve individual parents in the schools and to work towards establishing a district wide formation of parents to advocate for quality education.

Pursuant to the Memorandum of Agreement, KJAC was assigned five VISTA volunteers: Mary Kathy McManus, Gloria Claudio, Georgette Darwin, Antonia Rivera, and Shirley Sims. In October, 1981, Ms. McManus, who was a chairperson of the Education Committee at KJAC, helped organize and participated in a demonstration at the home of Mayor William Green. Ms. McManus participated in the October 10 demonstration as a parent, a church member, a member of the District 5 Parent Council and as a VISTA volunteer with the approval of Michael DiBernardinis, the supervisor of the KJAC/VISTA project. At the October 10 demonstration, the demonstrators made four demands: (1) open the schools now with no cutbacks in programs, (2) honor the contract, (3) alternative funding for public education, and (4) meet with the community.

In organizing the demonstration, Ms. McManus had contacted members of her church, other members of the School District 5 Parent Council, as well as other residents of the Kensington area. No contact, however, was made with anyone connected with the teacher's union, nor did the teacher's union participate in the demonstration.

Mary Kathy McManus is the mother of four children, all of whom are enrolled in public school. She is also a member of the School District 5 Parent Council, one of the eight districts in the Philadelphia area. In addition, Ms. McManus is an active member in the Episcopalian church where it is her mission to help improve public education in the Kensington community. Prior to organizing the demonstration, Ms. McManus, as a VISTA, together with KJAC and members of the Kensington community, examined the School District Budget for 1981–82 in order to determine what effect the School District of Philadelphia's proposed budget reductions would have on the school children in the Kensington community. This research showed that the four schools which Ms. McManus and other members of the community surveyed in the Kensington community were losing 128 school employees. They learned (it was publicly announced by the President of the School Board) that the bi-lingual educational program would be reduced by 75% in the Kensington community where one-third of the district is Hispanic. The proposed reduc-

tions of the School District of Philadelphia would also have reduced special educational services and the number of nurses in the Kensington area schools. Ms. McManus, being the mother of an emotionally disturbed child receiving special education services and the mother of a daughter with a kidney disease who needs a nurse in school to assist in the event of an emergency, felt that the proposed cutbacks in funds and service would particularly affect her own children and the educational services available in the Kensington community. Lastly, Ms. McManus and the community members who examined the proposed budget cuts, believed that the cutbacks would exacerbate the shortage of textbooks already being experienced by the schools in the Kensington community.

## V. THE DIRECTOR'S DECISION

■ Based upon the evidence submitted at the termination hearing, the director concluded that

the undisputed facts developed establish a material failure by the Kensington Joint Action Council to comply with the terms and conditions of the Agreement it had with ACTION, and with the terms and conditions of ACTION grant number 333–3036/2. The material failure consisted of a breach of Section 404(d) of the Domestic Volunteer Service Act of 1973 (42 U.S.C. § 5044(d)).

Section 404(d) of the Domestic Volunteer Service Act of 1973, 42 U.S.C. § 5044(d) provides

(d) no funds authorized to be appropriated herein shall be directly or indirectly utilized to finance labor or anti-labor organization or related activity.

In reaching the above conclusion the director determined that

The actions taken by Ms. McManus to organize and participate in the demonstration at the Mayor's house were labor organization related activities. Two of the demands of the demonstrators were to open the schools with no reductions in school programs, and to honor the contract. Both these demands were consist-

ent with the position of the UFT [United Federation of Teachers], and advocating them was, in effect, supporting the position of the union in a dispute with management.

The scope of our review of the director's decision is a limited one and is defined by the Administrative Procedure Act, 5 U.S.C. § 706, which provides, in relevant part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

\*   \*   \*   \*   \*   \*

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;

In employing the arbitrary and capricious standard,

A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." (Citations omitted).

*Bowman Transportation v. Arkansas-Best Freight*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *American Consumer, Inc. v. United States Postal Service*, 427 F.Supp. 589, 592 (E.D.Pa.1977). Further-

more, the term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Kelly v. Railroad Retirement Board*, 625 F.2d 486 (3d Cir. 1980). In addition, the Third Circuit has noted, "substantial means just that and is not the equivalent of a 'scintilla'." *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837 (3d Cir. 1974); *Wilson v. Weinberger*, 398 F.Supp. 1071 (E.D.Pa. 1975). Lastly, "[i]n making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

The Court has reviewed the entire administrative record and based upon that review has determined that the evidence appearing in the administrative record does not provide a substantial basis for the director's determination that Mary Kathy McManus' activities constituted a violation of 42 U.S.C. § 5044(d) on the part of KJAC. Furthermore, the Court has determined that the director's application of 42 U.S.C. § 5044(d) is not in accord with the obvious meaning of the statute and the congressional intent evidenced in its legislative history.

The sole evidentiary basis relied upon by the director in reaching the conclusion that Ms. McManus' organization of and participation in the demonstration constituted the use of appropriated funds directly or indirectly to finance labor organization or related activities is the fact that two of the demonstrators' demands (to open the schools with no cutbacks in programs and to "honor the contract") were consistent with the position of the United Federation of Teachers. This is *not* such evidence as a reasonable mind might accept as adequate to support the conclusion that appropriated funds were used directly or indirectly to support labor organization and related activity. On the contrary the uncontradicted evidence in this administrative record shows that Ms. McManus was a VISTA volunteer charged with involving the Kensington community in a direct action campaign to improve education in the community. Ms. McManus, together with other concerned members of the Kensington community, investigated the effect the proposed budget cutbacks and teacher layoffs would have on the schools serving the Kensington community. The evidence further shows that their survey revealed that the proposed cutbacks and reductions in educational programs would be detrimental to the education of their children. As a result of this investigation and their desire to have their children back in the classroom, Ms. McManus and other members of the Kensington community organized the October 10th demonstration and formulated the four demands advocated at the demonstration. There is no evidence in the record that Ms. McManus or other participants in the demonstration had any contact with the teachers' union in organizing the demonstration. There was no participation by the union in the demonstration, nor any endorsement of the demonstration by the union. Furthermore, the demonstrators did not endorse the "strike", rather, as heretofore pointed out, these parents wanted their children back in school. The uncontradicted evidence clearly shows that the demonstration was a community oriented and education-related activity and the mere fact that two of the demonstrators' demands were considered by the director as having coincided with positions taken by the union, standing alone, does not rationally support a conclusion that the demonstration was a labor organization related activity. The fact that members of the Kensington community were opposed to reductions in educational programs in the Kensington schools is certainly not indicative of union activity. Furthermore, a demand to honor the contract was at most ambiguous on October 10, 1981 in view of Judge Takiff's decision on September 4th that the contract was viable only to the extent that funds were available to the school district and Judge Crumlish's decision on October 29th holding that the 1980–81 contract was the last valid agreement between the parties. *See Philadelphia Federation of Teachers Local No. 3 v. Thomas,*

—— Pa.Cmwth.Ct. ——, 436 A.2d 1228, 1230 (1981).

■ The essential failure evidenced in the director's opinion is that it fails to take into account that the crisis besetting the Philadelphia school system in October 1981 involved more than the interests of labor and management; it involved critical issues concerning education, taxation and city finances. It was a public issue. Parents with children in the public school system were deeply concerned; their children had been out of school, on October 10th, for over a month. Residents of Philadelphia who did not have children in the city school system were also concerned about the crisis facing public education in the city of Philadelphia. This was not simply a two-sided dispute between labor and management. As Judge Crumlish pointed out in *Philadelphia Federation of Teachers Local No. 3 v. Thomas*, —— Pa.Cmwth.Ct. ——, 436 A.2d at 1229 (1981),

> [A]s in all labor disputes, whether in the public or the private sector, the fallout usually affects innocent third parties, the school children of Philadelphia. There can be no greater demand made upon these litigants and upon this Court than to address and resolve their differences because the innocent are helpless hostages.

It was arbitrary and capricious for the director in his decision to assume that every parent who advocated an immediate end to their children's forced exodus from the classroom or decried a reduction in school programs supported the strike by the teachers' union. In light of the overwhelming uncontradicted evidence showing the absence of any union connection with the demonstration or any motive, purpose, intent, or effect of the demonstration other than to focus the Mayor's attention on the concerns of parents in the Kensington community, the director's decision must be deemed arbitrary, capricious and unsupported by substantial evidence.

■ Lastly, the director's finding that Ms. McManus' activities as a VISTA volunteer violated section 404(d) of the Domestic Volunteer Service Act, 42 U.S.C. § 5044(d) which prohibits the use of appropriated funds to directly or indirectly finance labor organization or related activity is contrary to the meaning and intent of the statute. As the director correctly noted in his decision, § 404(d) is directly derived from § 834(d) of the Economic Opportunity Act of 1964, 42 U.S.C. § 2994c(d), which was repealed by section 603 of the Domestic Volunteer Service Act of 1973. *See* Senate Report 93–311 (1973), p. 105, U.S.Code Cong. & Admin. News 1973, p. 2155. Section 834(d) was proposed by Congressman Charles S. Gubser as part of the Economic Opportunity Amendments of 1967. In relation to the amendment Mr. Gubser stated,

> Mr. Chairman, I am sure both sides of the aisle agree that Federal funds should not be used in labor union activity or for organizing purposes. Labor union organization is a proper activity but it should not be financed by the Federal taxpayers. I am sure we all agree to that.
>
> This is the present policy of the Office of Economic Opportunity. Regulations promulgated by Mr. Shriver [Director of the Office of Economic Opportunity] state very clearly that labor union activities cannot be financed through OEO funds . . . All that my amendment does is to simply state in the law what is the present policy of the Office of Economic Opportunity. *Congressional Record*, November 15, 1967, p. 32699.

The parties stipulated that there are no federal regulations interpreting this statute. It is clear from the face of the statute and its legislative history that this statutory provision was intended to prevent taxpayers' money from being used to finance labor union organization and related activity or anti-union groups and their activities. There is no evidence in this record that any funds were so used. On the contrary, the evidence shows that although Ms. McManus received federal funds for her work as a VISTA volunteer, as heretofore pointed out, there is no substantial evidence in this record connecting Ms. McManus or KJAC either directly or indirectly with labor organization or related activity.

The Court having determined that the director's decision is arbitrary, capricious, unsupported by substantial evidence and contrary to law, the Court will enter an order setting aside the director's decision and ordering the reinstatement of KJAC.

In view of the Court's determination that the decision of the director of ACTION will be set aside, the Court will not consider the alleged constitutional violations raised by the plaintiffs on the basis of the admonition of the Supreme Court in *Hagans v. Lavine*, 415 U.S. 528, 548, 94 S.Ct. 1372, 1385, 39 L.Ed.2d 577 (1973), that "a federal court should not decide federal constitutional questions where a dispositive non-constitution ground is available."