525 A.2d 359

Ernest ODGERS, et al, Arnold Nayowith, et al, Appellees,

v.

COMMONWEALTH of Pennsylvania, UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 21, 1986.

Decided March 31, 1987.

Charles Hasson, Deputy Chief Counsel, James K. Bradley, Associate Counsel, Paul E. Baker, Acting Deputy Chief Counsel, Barry M. Hartman, for appellant.

Deborah R. Willig, Alaine S. Williams, for appellees.

Marvin Comisky, David F. Girard-diCarlo, Ronald H. Surkin, Sarah A. Kelly, for amicus—School Dist. of Philadelphia.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

Appellant, Commonwealth of Pennsylvania, Unemployment Compensation Board of Review (Board), appeals by

allowance a Commonwealth Court order reversing orders entered by the Board. The Board had affirmed decisions of a Referee and the Office of Employment Security denying unemployment compensation benefits to appellees, teachers employed by the School District of Philadelphia (School District).[1] The ultimate question presented by this appeal is whether the work stoppage in which appellees engaged from September 8, 1981, through October 27, 1981, was the result of a strike or a lock-out under the terms of Section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d). We hold that it was a lock-out by the School District and thus affirm the order of Commonwealth Court.

## I.

The Philadelphia Federation of Teachers (PFT) is the duly certified collective bargaining representative for approximately 22,000 School District employees, a majority of whom are teachers. The School District is managed by a Board of Education (School Board) appointed by the Mayor of Philadelphia. *See* the First Class City Public Education Home Rule Act, Act of August 9, 1963, P.L. 643, *as amended*, 53 P.S. §§ 13201–13223 (Supp.1986); 351 Pa.Code §§ 12.12–200 and 12.12–201.

In September, 1980, the School Board and the PFT executed a collective bargaining agreement (Agreement) for the period September 1, 1980, through August 31, 1982.[2]

---

**1.** Ernest Odgers and Arnold Nayowith, the named appellees herein, represent approximately 20,000 similarly-situated employees, members of the Philadelphia Federation of Teachers (PFT). On October 2, 1981, the PFT, the Philadelphia School District and the Office of Unemployment Security entered a test claim agreement providing that the decision on Odgers' and Nayowith's claims would be dispositive of similar claims by other School District employees.

**2.** The City of Philadelphia, though not a party to this agreement, played a key role in these contract negotiations. As described by Commonwealth Court:

The record reveals a pattern of conduct, although advisory and unofficial, by City officials, including the Mayor and his executive

Among the terms bargained for and agreed to were specific provisions for maximum class size and preparation time, a guarantee of adequate monies to fund the Agreement,[3] and a general provision that the School Board would solicit the PFT's views on long-range educational goals prior to School Board action. The Agreement also provided for "full and complete job security" for all employees.[4] All of the fore-

officers, in the negotiation of contracts between the Board and the Federation since at least 1972.

The record is replete with examples of City involvement in the bargaining process. Specifically, the City assured the parties that it would pursue at least four avenues of funding: 1) refinancing the School District's long-term debt; 2) pressing the state to fully fund the general subsidy program; 3) provide leadership in obtaining Federal revenues and 4) seeking further appropriations from City Council. The City also strongly recommended that the parties amend the proposed job security clause since the language of the provision would substantially hamper the City's efforts to secure funding from financial institutions.

The long history of City participation coupled with the City's specific input into the negotiations with no actual or apparent authority to affect the signatories' obligations, added an additional dimension to Philadelphia public education law, a dimension never heretofore resolved by traditional public labor law and contract principles.

*Philadelphia Federation of Teachers v. Thomas,* 62 Pa.Commonwealth Ct. 286, 290–91, 436 A.2d 1228, 1230–31 (1981) (footnotes deleted). *See also* Miscimarra, *Inability to Pay: The Problem of Contract Enforcement in Public Sector Collective Bargaining,* 43 U.Pitt.L.Rev. 703, 715–720 (1982).

3.  Article B–XIV (Guarantee Clause) of the Agreement provides:

    During the term of this Agreement, the Board agrees that it will appropriate in its annual budget(s) for each year of the contract sufficient monies to provide for, maintain and guarantee without exception each and every economic provision set forth in this Agreement. The Board further agrees that it will not, under any circumstances, unilaterally abrogate any economic provision of this Agreement during its term.

    Memorandum of Law in Support of Reversing the Determination of the Office of Employment Security, Exhibit A, R.R. at 874a.

4.  Article B–XV (Job Security) of the Agreement provides, in pertinent part:

    1. The parties agree that all employes who were regularly appointed to a full-time and/or part-time position and who were employed in that position during September 1, 1979 to June 30, 1980 school year shall be reemployed effective immediately and/or continued to be employed in their positions continuously during the term of this Agreement, thereby guaranteeing such employes full and complete

going provisions applied to the complete term of the two-year agreement. In only one major respect did the two years of this agreement differ: there was no salary increase provided for the 1980–81 school year, but a ten percent increase in salary was provided for the 1981–82 school year.[5]

In May, 1981, eight months after execution of the Agreement, the School Board informed the PFT that its proposed budget request had been rejected by City Council and it anticipated a budget deficit of approximately $102,000,000 during the 1981–82 school year if the express terms of the Agreement were honored.[6] The PFT refused the School Board's request to renegotiate the Agreement, but offered to assist its efforts to obtain sufficient city funding for the Agreement.

The School Board then adopted a shortfall budget for the 1981–82 school year, and announced several changes in its operations, effective September 1, 1982. These included layoff of approximately 3,500 members of the PFT and elimination of the ten percent wage increase.[7] In June,

job security during the term of this Agreement, except that in each job classification, employes may be laid off only in proportion to the projected decline in pupil enrollment as of the allotment date for the second year of this Agreement, such layoffs to be effective in that year only after giving required notice to such employes on or before June 30, 1981.

Memorandum of Law in Support of Reversing the Determination of the Office of Employment Security, Exhibit B, R.R. at 875a.

5. As set forth in Article B–XV, *supra* note 4, layoffs would be permitted in the second year of the Agreement, but only to the extent necessitated by declining enrollment.

6. Because its members are appointed rather than elected, the Philadelphia School Board may not independently raise revenues. It receives only tax revenues authorized by City Council and earmarked for it. Unlike every other school board in Pennsylvania, it is fully dependent upon other political bodies (the city, the state and the federal government) for funding. *See* Pa. Const. art. III, § 31. *See also Danson v. Casey*, 484 Pa. 415, 399 A.2d 360 (1979); *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937). The Education Supplement to the Philadelphia Home Rule Charter requires the School Board to operate within a balanced budget. 351 Pa.Code § 12.12–303(a).

7. Other changes for the 1981–82 school year were:
   increase in class size from 33 to 37 students;

1981, the School Board mailed 3,498 layoff notices to School District employees, informing them that there were no positions available for them during the 1981–82 school year.

These layoff notices became effective on September 1, 1981, and the 3,498 employees were laid off by the School Board. The other operational changes were also effected, including the increase in class size and the reduction in preparation time. On September 8, 1981, the first day of scheduled classes for the 1981–82 school year, members of the PFT began a work stoppage.

## II.

In May, 1981, the PFT had filed suit in the Philadelphia Court of Common Pleas to enforce the existing collective bargaining agreement through August 31, 1982. On September 4, 1981, Common Pleas dismissed this complaint, holding the Agreement was subject to a condition precedent of sufficient city appropriation each year to fund it. The court held, however, that the terms of the Agreement would be in effect for the 1981–82 school year to the extent that they were funded by the City. *Philadelphia Federation of Teachers v. Board of Education*, 6 Phila. 222 (C.P.Pa. 1981).[8]

> elimination of scholarships;
> reduction of extracurricular activities;
> reduction of equipment for non-instructional areas;
> elimination of use of school buildings for after-school recreational purposes;
> reduction of the number of proposed alterations;
> elimination of expansion in curriculum and instruction;
> reduction of anticipated short-term interest expenses;
> elimination of the expansion of executive and school district management positions.
>
> Pennsylvania Unemployment Compensation Board of Review, Referee's Decision, Finding of Fact No. 4, R.R. at 813a.

8. This decision did not speak to the questions of which parts of the Agreement were to be changed, how the parts for change should be selected, or who had authority to change them. These problems were discussed in *International Brotherhood of Firemen and Oilers, Local 1201 v. Board of Education*, 500 Pa. 474, 457 A.2d 1269 (1983), and in *Philadelphia Federation of Teachers v. Thomas*, 62 Pa. Commonwealth Ct. 286, 436 A.2d 1228 (1981). In its decision in *Thomas*, discussed

In mid-September, the School Board filed its complaint in equity in the Philadelphia Court of Common Pleas, asking that court to enjoin the work stoppage and order the teachers back to work. On October 7, 1981, Common Pleas did order the teachers back to work, now holding that the lack of funding effectively terminated the Agreement. *Board of Education v. Philadelphia Federation of Teachers,* (No. 1851 September Term 1981, filed October 7, 1981).

The PFT appealed both decisions to Commonwealth Court. The cases were consolidated and decided in *Philadelphia Federation of Teachers v. Thomas,* 62 Pa.Commonwealth Ct. 286, 436 A.2d 1228 (1981). Commonwealth Court held that the Agreement was a severable contract with each year subject to a condition precedent, funding by "the independent legislative bodies over which neither party had any actual control." *Thomas,* 62 Pa.Commonwealth Ct. at 296, 436 A.2d at 1233. That posited condition had been fulfilled with respect to the 1980–81 school year, but not for 1981–82. Thus, Commonwealth Court concluded, the PFT and the School Board had no binding agreement for 1981–82. *Id.* Neither the PFT nor the School Board appealed this decision.

During the work stoppage, appellees herein (claimants) submitted claims for unemployment compensation benefits for the weeks ending September 19 and September 26, 1981. On October 8, 1981, the Office of Employment Security issued its determination denying their claims. Claimants appealed this decision to a Referee, who affirmed the denial in July, 1982. Claimants then appealed to the Unemployment Compensation Board of Review (Board). In April, 1983, it affirmed the Referee's decision, finding that the work stoppage was a strike rather than a lock-out. Claimants appealed this decision to Commonwealth Court, which

*infra* at 385, 386–389, Commonwealth Court attempted to answer these questions by treating the two-year agreement as severable. In *International Brotherhood of Firemen and Oilers,* 500 Pa. at 478–79, 457 A.2d at 1271, we rejected the Philadelphia School District's argument that sufficient city funding was a condition precedent to payment of agreed-upon salary and wage increases, where such a condition was not expressly stated in the collective bargaining agreement.

reversed the Board, holding that the work stoppage was a lock-out. *Odgers v. Unemployment Compensation Board of Review*, 89 Pa.Commonwealth Ct. 439, 492 A.2d 808 (1985) (*en banc*). We granted the Board leave to appeal the order of Commonwealth Court in April, 1986.

## III.

We are called upon to determine whether the work stoppage in which appellees engaged from September 8, 1981, through October 27, 1981, was a strike or a lock-out under the terms of Section 402(d) of the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d). Section 402(d) of the Act provides, in pertinent part:

> An employe shall be ineligible for compensation for any week—
>
> (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . .

43 P.S. § 802(d).

Before reaching that issue, however, we must first determine whether to give preclusive effect here to Commonwealth Court's classification of this work stoppage as a strike in its decision ordering appellees and other members of the PFT back to work in the suit to enjoin the stoppage. *See Philadelphia Federation of Teachers v. Thomas*, 62 Pa.Commonwealth Ct. 286, 436 A.2d 1228 (1981). Appellant contends that Commonwealth Court's order directing mediation and a return to work "clearly points to" a binding determination that the work stoppage was an illegal strike.[9]

Two issues were determined in *Thomas:* the status (enforceability) of the Agreement between the PFT and the School Board and the legality of the work stoppage by

---

**9.** It is apparent from its brief and oral argument that appellant is arguing in terms of what used to be called collateral estoppel and is now usually referred to as issue preclusion. *See Restatement (Second) of Judgments* § 27 (1982).

members of the PFT. To resolve the latter issue, Commonwealth Court had to determine whether the failure to fully fund the second year terminated the Agreement and properly opened the matter to collective bargaining negotiations.[10] If so, it also had to find an impasse existed between the School Board and the PFT under the terms of the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, No. 195, *as amended*, 43 P.S. §§ 1101.101–1101.2301 (Supp.1986). Section 1002 of PERA prohibits strikes "during the pendency of collective bargaining procedures." It states:

> Strikes by public employes during the pendency of collective bargaining procedures set forth in sections 801 and 802 of Article VIII are prohibited. In the event of a strike during this period the public employer shall forthwith initiate an action for the same relief and utilizing the same procedures required for prohibited strikes under section 1001.

43 P.S. § 1101.1002.[11] Because it determined that the Agreement constituted a severable contract, the second year of which was not binding upon the parties due to the unavailability of sufficient funding, Commonwealth Court held that, *as of the date of its order*, the School Board and the PFT were at impasse and the strike by the PFT was prohibited under Section 1002 of PERA. *Thomas*, 62 Pa. Commonwealth Ct. at 298–99, 436 A.2d at 1234.

The members of the PFT, including appellees, returned to work on October 28, 1981, the day after Commonwealth Court issued its opinion in *Thomas*. Because Commonwealth Court expressly held the strike illegal (i.e., in contravention of the terms of PERA) only from the date of its opinion forward, appellant's attempt to characterize the work stoppage as an illegal strike, under *Thomas*, that

10. *See supra* note 8, at 383–384.

11. Section 1001 prohibits strikes by guards at prisons or mental hospitals and by court personnel. 43 P.S. § 1101.1001. The collective bargaining procedures to which Section 1002 refers are voluntary and mandatory mediation provisions. 43 P.S. §§ 1101.801 and 1101.802.

should preclude an award of unemployment compensation benefits as a matter of public policy is, at best, inapposite.

Furthermore, we decline to give effect in this case to the characterization of the instant work stoppage as a strike in Commonwealth Court's line of cases culminating in its decision in *Thomas, supra*. Indeed, we expressly rejected Commonwealth Court's creation of a condition precedent in *International Brotherhood of Firemen and Oilers, see supra* note 8, in the context of the objectives of PERA. It has even less force in the context of our Unemployment Compensation Law's distinction between strikes and lockouts, in which we look to who adversely disturbed pre-existing conditions to distinguish voluntary from involuntary unemployment. *See Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review (Vrotney Unemployment Compensation Case)*, 400 Pa. 440, 163 A.2d 91 (1960).[12]

The Public Employe Relations Act and the Pennsylvania Unemployment Compensation Law were enacted to promote decidedly different public policies of this Commonwealth. Section 101 of PERA provides, in pertinent part:

**12.** We note that this case presents no willful misconduct issue under Section 402(e) of the Unemployment Compensation Law, as in *Penflex v. Bryson*, 506 Pa. 274, 485 A.2d 359 (1984). In *Penflex*, consistent with a line of appellate cases distinguishing on the basis of causation situations in which Section 402(d) on work stoppages applies from those involving willful misconduct under 402(e), we held claimants' unemployment was caused by their discharge at the same time the work stoppage there began. The claimants in the present case were not at any time discharged or furloughed, but engaged in a work stoppage to protest the School District's refusal to honor the Agreement's terms in its second year. *See Penflex*, 506 Pa. at 287–89, 485 A.2d at 365–66. Their unemployment resulted exclusively from the work stoppage to which 402(d) applies. Parenthetically we note that those employees who were furloughed did receive benefits at the administrative level pursuant to Section 402.1(1) and (2) because they had no reasonable expectation of returning to work in September, 1981. 43 P.S. § 802.1(1) and (2) (Supp.1986). *See Odgers*, 89 Pa.Commonwealth Ct. at 445 n. 8, 492 A.2d at 812 n. 8. Their unemployment resulted from termination of their employment in breach of the Agreement; it obviously was not voluntary and could not be due to willful misconduct.

[I]t is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare.... Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public employers to negotiate and bargain with employe organizations representing public employers and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large.

43 P.S. § 1101.101. In Section 3 of the Pennsylvania Unemployment Compensation Law, on the other hand, the legislature voices a different concern:

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. Involuntary unemployment and its resulting burden of indigency falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance.... The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require ... the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

43 P.S. § 752. PERA was enacted to accord public employees the right to organize and bargain with their employers, in the belief that establishing harmonious relationships between these parties would inure to the public benefit, in

part through reduction in the number and duration of work stoppages. *See Pennsylvania Labor Relations Board v. State College Area School District*, 461 Pa. 494, 502–03, 337 A.2d 262, 266 (1975); *Western Psychiatric Institute v. Pennsylvania Labor Relations Board*, 16 Pa.Commonwealth Ct. 204, 211, 330 A.2d 257, 260–61 (1974). While the Unemployment Compensation Law indirectly benefits the public, its principal objective is the alleviation of economic distress in individual cases, where employees become unemployed through no fault of their own. *See Penn Hills School District v. Unemployment Compensation Board of Review*, 496 Pa. 620, 624–25, 437 A.2d 1213, 1215 (1981); *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 110, 242 A.2d 454, 459 (1968).

■ It logically follows that the determination of what constitutes a strike for purposes of PERA is not coextensive with the determination whether a work stoppage is a strike or a lock-out under the terms of the Unemployment Compensation Law; these acts embody different policies and involve different rights (the former attaching to the collective and the latter to the individual). Although our courts have sought in *Thomas* and now in *Odgers* to describe the contours of the instant work stoppage in terms that on the surface appear identical, the issue litigated in *Thomas* is not identical to the issue now before us. Thus, we are not constrained to give it conclusive effect. *See Safeguard Mutual Insurance Co. v. Williams*, 463 Pa. 567, 574–77, 345 A.2d 664, 668–70 (1975). *See also Restatement (Second) of Judgments* § 27 comment c (1982).[13] The legal

13. Identity of issues is but one of the requirements for successful assertion of the doctrine of collateral estoppel. For the determination of an issue to be given preclusive effect, there must also have been a prior, final judgment on the merits, and the party against whom the claim is asserted must have been a party to the prior adjudication who had full and fair opportunity to litigate the issue then in question, or be in privity with such a party. *Safeguard Mutual Insurance Co. v. Williams, supra, citing In re Estate of Ellis*, 460 Pa. 281, 333 A.2d 728 (1975) (rejecting the requirement of mutuality of estoppel, so long as the party against whom the claim is asserted has had a full and fair opportunity to litigate the issue in question; this is another way in which the doctrines of collateral estoppel and *res judicata* may be

issue of whether this work stoppage is a strike or a lock-out under Section 402(d) of our Unemployment Compensation Law thus remains open on appellees' representative claims for unemployment compensation benefits, for those unfurloughed employees who took part in this work stoppage.

## IV.

■ Here the Board determined the work stoppage was a strike and so denied benefits. To affirm Commonwealth Court's reversal, which granted benefits, we must determine that the Board erred as a matter of law in not finding a lock-out on this record. The standard of review any appellate court must apply, when the party with the burden of proof lost before the Board, is whether the Board erred as a matter of law or capriciously disregarded competent evidence. *See, e.g., Borello v. Unemployment Compensation Board of Review,* 490 Pa. 607, 611, 417 A.2d 205, 207 (1980); *High v. Unemployment Compensation Board of Review,* 67 Pa.Commonwealth Ct. 472, 473 n. 2, 447 A.2d 701, 702 n. 2 (1982). This record shows that the Board did err as a matter of law by requiring the PFT members to offer to return to work under the 1980–81 working conditions. Thus, we affirm Commonwealth Court's order directing an award of benefits.

In assessing responsibility for a work stoppage we said in *Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review (Vrotney Unemployment Compensation Case),* 400 Pa. 440, 163 A.2d 91 (1960):

The law contemplates that collective bargaining will be conducted in good faith, with a sincere purpose to find a basis for agreement. Neither an adamant attitude of 'no contract, no work' on the part of the employees, nor an ultimatum laid down by the employer that work will be

distinguished). Clearly, *Thomas, supra,* was a final judgment on the merits. Because we have determined that the issue in that labor case and the one in this unemployment compensation proceeding involve different policies and principles, we need not and do not decide whether appellees herein, individual members of the PFT and the parties against whom the claim is asserted, are in privity with the PFT, which was a party to the suit in *Thomas.*

available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise. While either or both of these positions may legitimately be taken by the parties during the bargaining negotiations prior to the expiration of the existing contract, when the contract has in fact expired and a new agreement has not yet been negotiated, the sole test under § 402(d) of the Unemployment Compensation Law, ... of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

400 Pa. at 444–45, 163 A.2d at 93 (footnote and citations omitted). *Accord, Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 454 A.2d 517 (1982); *Borello v. Unemployment Compensation Board of Review, supra; Unemployment Compensation Board of Review v. Sun Oil Co.*, 476 Pa. 589, 383 A.2d 519 (1978); *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968).

We acknowledged in *Philco Corporation, supra,* that the *Vrotney* test is "easy to verbalize, but most difficult to apply to any given set of facts." 430 Pa. at 103, 242 A.2d at 455. To aid in its analysis, the *Philco* court looked to the purpose of the Unemployment Compensation Law:

Since the purpose of our unemployment compensation system is to compensate an individual when work has

been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine *which side, union or management, first refused to continue operations under the status quo* after the contract had technically expired, but while negotiations were continuing.

*Id.* (emphasis added). While it is the general rule that when a work stoppage "takes the *form* of a strike, the burden is upon the union to show that it made the initial 'peace' move by offering to continue the status quo", *Id.*, 430 Pa. at 104, 242 A.2d at 456, we have held that the union's burden is satisfied where the employer's unilateral actions in fact disturb the status quo. *See Local 730*, 505 Pa. at 485, 490, 480 A.2d at 1003, 1006.

Such was the situation here. The School District was the first party to alter the status quo on working conditions; it was also the first party to breach the Agreement.[14] The first year of the Agreement expired on August 31, 1981. In May, 1981, three months before expiration of year one of the Agreement, the School District announced various operational changes to be effected September 1, 1981, the first day of what the parties had originally intended to be the second year of the Agreement. These changes included the layoff of approximately 3,500 employees, an action that was proscribed under Article B–XV of the Agreement, which permitted layoffs only to the extent necessitated by declining pupil enrollment. *See supra* notes 4 and 5, at 360–61. The School District mailed these layoff notices in June, 1981, and it laid off 3,498 employees on September 1, 1981.

---

**14.** These facts do not provide distinctions that in prior cases have resulted in divisions within the Court over whether the *Vrotney* test of who disturbs the *status quo ante* relates to actual pre-existing working conditions or those called for by the agreement, *see Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986) (Hutchinson, J., dissenting), and whether an employer's offer to improve them is such a disturbance, *see Local 730, United Association of Journeymen and Apprentices of the Plumbing and Pipe-Fitting Industry v. Unemployment Compensation Board of Review*, 505 Pa. 480, 480 A.2d 1000 (1984) (Hutchinson, J., dissenting, joined by Flaherty, J.).

On September 8, 1981, the first scheduled day of classes for the 1981–82 school year, which became the first day of the work stoppage, teachers in the Philadelphia school system would have had to return to work, if they had chosen to work, under conditions that were significantly different from those that existed on the last day of classes in the preceding school year. Class size would have been increased from 33 to 37 students and teacher preparation time would have been reduced, drastically in some cases. The School District unilaterally changed these and other conditions that existed in the workplace before the work stoppage, to the detriment of its employees, by implementing employment terms that were different from those agreed to in the parties' collective bargaining agreement. Moreover, these changes were not *de minimis*. The School District failed to continue even the relationship that existed at the time it repudiated the Agreement. *See Fairview School District, supra*, 499 Pa. at 546–47, 454 A.2d at 521. Under these circumstances, the PFT members did not have the option of offering to work under the conditions existing during 1980–81, the first year of the parties' two-year agreement. Their choices were two: to agree to work under unilaterally imposed, changed conditions, or to withhold their services. We have never held that an employee must choose the former course in order to preserve entitlement to unemployment compensation benefits, and we decline to do so now.

The Public Employe Relations Act was enacted to give public employees the right to organize and bargain with their employers. 43 P.S. § 1101.101. The purpose of our Unemployment Compensation Law is "to prevent the worker from becoming the innocent pawn of forces and movements beyond his control." *Philco Corporation*, 430 Pa. at 110, 242 A.2d at 459 (quoting *Lybarger Unemployment Compensation Case*, 418 Pa. 471, 478, 211 A.2d 463, 467 (1965)). To deny unemployment compensation benefits to claimants whose bargaining representatives were faced with the situation confronting the PFT in September, 1981, would make illusory the agreements made by public em-

ployees in this Commonwealth as a result of their good faith collective bargaining with their employers over the terms and conditions of their employment. The "iffy" benefits of bargaining an agreement under those conditions would advance neither PERA's purpose of reducing strikes and promoting labor peace in the public sector nor the Unemployment Compensation Law's purpose of providing relief to persons who are involuntarily unemployed by lock-outs, as set forth in Section 402(d).

Because the changes implemented by the School District in September, 1981, constituted a disruption of the status quo, we hold that the work stoppage in which appellees and other members of the PFT engaged resulted from a lock-out under Section 402(d) of the Pennsylvania Unemployment Compensation Law.

Accordingly, we affirm Commonwealth Court's order.

NIX, C.J., concurs in the result.

McDERMOTT, J., concurs in the result.