John W. BRAXTON

v.

UNITED PARCEL SERVICE, INC., et al.

Civ. A. No. 91–3950.

United States District Court, E.D. Pennsylvania.

Sept. 28, 1992.

Judith Brown Chomsky, Philadelphia, Pa., for plaintiff.

Richard H. Markowitz, Markowitz & Richman, Philadelphia, Pa., for Teamsters Union Local 623.

Eric Hoffman, Philadelphia, Pa., for United Parcel Service.

## MEMORANDUM

DALZELL, District Judge.

Plaintiff, John W. Braxton, has brought this action against his labor union and former employer chiefly because he believes his union did not fairly represent him after United Parcel Service discharged him on December 27, 1990. Mr. Braxton seeks in this action to replay the internal political warfare within the International Brotherhood of Teamsters that resulted in the recent election of Mr. Braxton's fellow dissident, Mr. Ron Carey, as President of the International Brotherhood of Teamsters. Because we agree with Local 623 and United Parcel that the issues presented here are confined to the more mundane questions surrounding the particulars of Mr. Braxton's termination, and because we agree that the Local more than fulfilled its duty to champion Mr. Braxton's interests through the rights conferred upon him under the collective bargaining agreement between United Parcel and Local 623, we will grant the motions for summary judgment that the Local and United Parcel have filed.

### Background

The basic facts necessary to understand this case are undisputed and largely come from Mr. Braxton himself.

No one would likely accuse John Braxton of impersonating a stereotypical Teamster. After graduating near the top of his class at the William Penn Charter School in Philadelphia, Mr. Braxton graduated from Swarthmore College in 1970. After a period of work with the Quaker Action Group and later the Academy of Natural Sciences in Philadelphia, Mr. Braxton earned a master's degree in ecology from Rutgers University, Braxton dep. at 6, and in recent years has taught biology at Community College of Philadelphia.

Mr. Braxton began part-time employment with United Parcel Service in February of 1978. After working for eleven years at the United Parcel facility on East Oregon Avenue in Philadelphia, in August of 1989 Mr. Braxton was transferred to the new United Parcel Hog Island warehouse at Philadelphia International Airport. During these thirteen years, Mr. Braxton had various jobs, including sorting, package handling, and truck unloading. Pertinent to the current controversy, he also became a union steward and, more visibly, an active member of Teamsters for a Democratic Union ("TDU"), which challenged the then-incumbent leadership of the International Brotherhood of Teamsters.

It is also undisputed that Mr. Braxton achieved a certain degree of notoriety because of his TDU work and was referred to in the national press as "a TDU leader from Philadelphia." *See, e.g., Los Angeles Times,* November 1, 1990, p. 1, col. 5 ("Reformers Taking Aim at Entrenched Teamsters"); *see also Christian Science Monitor,* August 16, 1988, p. 3 ("Teamsters See 'A Whole Lotta Shakin' Going On' in Union"); *New York Times,* April 25, 1986, p. A–10 ("Move to Change Teamsters Steps Up"). The TDU was ultimately triumphant after its slate, led by Mr. Ron Carey, won the national Teamsters election on December 12, 1991.[1]

In the less glamorous workplace at United Parcel Service, however, Mr. Braxton often ran afoul of his supervisors. During his ten-day deposition, he was asked how many "disciplinary notices or warnings" he had received during his tenure from United Parcel, and answered, "I would have to make a rough guess and say probably a hundred." Braxton dep. at 16. In his deposition, Mr. Braxton reported that in 1988 "I received two suspensions" and, after about a year's quiet, the "disciplinary notices or warnings" returned "beginning in January of 1990". Braxton dep. at 27.

1. According to *The New York Times,* "Not since the United Mine Workers recaptured their corrupt union in 1972 have the rank and file organized such a revolution from below." *New York Times,* December 13, 1991, A–39, col. 2 ("Can it Be Morning in Teamsterland?").

This succession of "disciplinary notices or warnings" culminated in the events of late December, 1990. It is undisputed that on Thursday, December 27, 1990, Mr. Braxton was discharged. In its termination letter to Mr. Braxton, United Parcel cited as the reasons for his firing "your continual failure to follow instructions and verbally abusing your supervisor." In accordance with Article 46 of the collective bargaining agreement between United Parcel and Local 623, the Local grieved Mr. Braxton's discharge.[2] Because United Parcel and Local 623 did not resolve the grievance at the grievance procedure stage, pursuant to Article 46, § 3 of the Supplemental Agreement, Local 623 appealed Mr. Braxton's discharge to the Atlantic Area Parcel Grievance Committee (which the parties refer to as the "AAPGC"), composed of three members appointed by United Parcel and three by the Union. Section 3(g) of Article 46 provides that in cases like Mr. Braxton's "an impartial arbitrator will sit as a seventh (7th) panel member of the AAPGC, and shall render a bench decision on all deadlocked cases."

The AAPGC panel convened in Williamsburg, Virginia on January 15, 1991, and Local 623 President Dennis Laczo represented the Union. Both Mr. Laczo and Mr. Braxton offered extensive evidence and arguments at the AAPGC's hearing in support of the Union's position that United Parcel Service lacked "just cause" to discharge Mr. Braxton. Article 48 of the Supplemental Agreement with Local 623 provides that United Parcel "shall not discharge nor suspend any employee without just cause...." The transcript of the AAPGC proceeding, attached as Exhibit C to Mr. Laczo's affidavit, documents in sixty-nine single-spaced pages the events of the January 15 hearing.[3] The AAPGC found that United Parcel had "just cause" to discharge Mr. Braxton and voted to sustain his discharge.

Thereupon, Mr. Braxton filed this action under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). He also invokes his rights under the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411.

Mr. Braxton's complaint asserts six counts. The first three counts allege breach of the duty of fair representation against the International Brotherhood of Teamsters (First Count), the Eastern Conference of Teamsters (Second Count) and Local 623 (Third Count).[4] The Fourth Count alleges that these union entities violated Mr. Braxton's rights under the LMRDA. The Fifth Count alleges that United Parcel Service discharged Mr. Braxton without "just cause" in violation of the Collective Bargaining Agreement, and the Sixth Count claims that United Parcel Service conspired with the union defendants because it "knowingly employs a grievance procedure pursuant to which grievances are decided by 'committees' consisting of representatives from company and union for the purpose of hampering the activities of union dissidents" (Complaint ¶ 42), thereby furthering "the union defendants in

---

**2.** The National Master United Parcel Service Agreement and Teamsters Local Union No. 623 Supplemental Agreement was attached as Exhibit A to the Affidavit of Dennis Laczo, appended to Local 623's Memorandum of Law in Support of its Motion for Summary Judgment. This governing contract will in this memorandum be referred to as the "Supplemental Agreement" or the "Collective Bargaining Agreement." Article 46, entitled "Grievance Procedure", sets forth, in §§ 2–5, the procedure to challenge and, if necessary, appeal grievances under the Collective Bargaining Agreement. There is no claim in this action that either the Union or United Parcel violated the procedural rights of Mr. Braxton pursuant to Article 46 of the Collective Bargaining Agreement.

**3.** At the oral argument held on September 11, 1992, all parties agreed that the transcript of the January 15, 1991 AAPGC proceeding was accurate and conformable to Fed.R.Civ.P. 56(e) for purposes of considering these motions. *See* transcript of oral argument at 13–14. The AAPGC transcript will herein be referred as "AAPGC Tr." At no time has Mr. Braxton questioned the accuracy of the portions of the AAPGC transcript cited and considered in this memorandum. *See, e.g.,* transcript of oral argument at 29–30.

**4.** According to ¶¶ 5–7 of the complaint, these three entities are separate unincorporated associations. Each was represented by independent counsel in this action.

their violations of the duty of fair representation" (¶ 44).

On April 24, 1992, Mr. Braxton entered into a stipulation of dismissal pursuant to Fed.R.Civ.P. 41(a)(1) with the International Brotherhood of Teamsters and the Eastern Conference. Since that time, it was reported to the Court that plaintiff no longer pursues his "conspiracy" count.[5]

As a result of the foregoing, the First, Second and Sixth Counts have been voluntarily dismissed. Local 623 has filed a motion for summary judgment as to the Third and Fourth Counts and United Parcel seeks summary judgment as to the Fifth Count, the only remaining claim against the employer.

*Summary Judgment Standards*

Although Rule 56(e)'s requirements need no rehearsal, it will be useful in resolving these two motions to recall the Supreme Court's recent statements in *Lujan v. National Wildlife Federation,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In his Opinion for the Court, Justice Scalia, after quoting Rule 56(e)'s requirement that judgment "shall be entered" against the non-movant unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial", stated that "[t]he object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." 497 U.S. at 888, 110 S.Ct. at 3188. In stressing that assumptions cannot supplant the "specific facts" needed to sustain a complaint, Justice Scalia went on to say:

It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be

deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

497 U.S. at 889, 110 S.Ct. at 3189.

As will be seen, we regard Mr. Braxton's response to the motions for summary judgment to constitute an invitation to walk "the circular promenade" the Supreme Court has instructed federal courts to decline.

*Legal Analysis*

We begin by recalling the Supreme Court's general direction that "[a]ny substantive examination of a union's performance ... must be highly deferential" to the union, *Air Line Pilots Ass'n Int'l v. O'Neill,* — U.S. —, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51 (1991). As the Supreme Court noted almost thirty years ago in *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953), "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents".

Recognizing the union's critical importance to its members where, as here, the union is the exclusive bargaining representative, the Supreme Court has imposed a duty of fair representation which is breached "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). In a grievance procedure, the Supreme Court in *Vaca* ordained that the rule is "that a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion...." *Id.* at 191, 87 S.Ct. at 917.

As our Court of Appeals has noted in construing "perfunctory" as that word was used in *Vaca,* "we have recently made clear that whatever it may mean in other circumstances, '[m]ere ineptitude or negligence in the presentation of a grievance by a union has almost uniformly been rejected

---

**5.** *See* United Parcel's Memorandum in Support of its motion for summary judgment at 3, to which Mr. Braxton has taken no exception. We shall therefore treat the Sixth Count as withdrawn.

as the type of conduct intended to be included within the term "perfunctory"'". *Riley v. Letter Carriers Local No. 380*, 668 F.2d 224, 228 (3d Cir.1981), quoting *Findley v. Jones Motor Freight, Etc.*, 639 F.2d 953, 960 n. 2 (3d Cir.1981). As Judge Van Dusen held for the Court of Appeals in *Riley*,

> What is required is a showing of actual bad faith or arbitrary conduct. The fact that trained counsel could have avoided the error or pursued a different strategy is not enough.

*Id.*, citing *Findley, supra*, 639 F.2d at 961.[6]

■ Where, as here, a collective bargaining agreement contains grievance and appellate procedures concluding with binding arbitration by a joint employer-union panel, both sides are contractually bound by the decision, and the result is "[s]ubject to very limited judicial review", qualified only by the union's duty to the member under *Vaca. DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 2290, 76 L.Ed.2d 476 (1983). This rule is consistent with the powerful preference in federal labor law for arbitrating grievances that arise under collective bargaining agreements, and applying a "highly deferential" standard to the outcome of such arbitral processes, provided only that the union has fulfilled its duty of fair representation to the member.

Bearing in mind that only his claim against Local 623 remains, the question therefore becomes whether the Local fulfilled its duty of fair representation to Mr. Braxton. As will now be shown, our independent review of the record in the light most favorable to Mr. Braxton leaves us with no other conclusions than (1) the Local vigorously pursued Mr. Braxton's cause, (2) Mr. Braxton was given every opportunity to state his position, and, most notably, (3) Mr. Braxton himself contemporaneously acknowledged his satisfaction with the Local's advocacy on his behalf. Under these circumstances, no "fair-minded jury could return a verdict for the plaintiff on the evidence presented", *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

We will first consider Mr. Braxton's claims against Local 623, and then review the remaining Count against United Parcel. As will be seen, the pertinent facts come largely out of Mr. Braxton's own mouth.

### A. Claims Against Local 623

1. The fair representation claim.

■ The day after Mr. Braxton's discharge, a meeting was held between United Parcel and Local 623 representatives, pursuant to Article 46, § 2 of the Supplemental Agreement. Present at this meeting was Dennis Laczo, Local 623 President, Alternate Shop Steward Tom Colaizzi, and Mr. Braxton. United Parcel Supervisor Paul Sharp and Pre–Road Manager Tom Jones participated. According to Mr. Braxton's account (Braxton dep. at 60–61), both he and Mr. Laczo argued that Mr. Braxton's conduct did not warrant discharge, and "that that was evidence of discriminatory treatment on their [United Parcel Services's] behalf and that I didn't deserve to be disciplined at all, but if I had been—if I was deserving of discipline, that to jump straight to a discharge was unfair and was discriminatory." When asked at his deposition what Mr. Laczo said, Mr. Braxton responded:

A. He agreed with that statment [*sic*]. He made similar statements to that effect.

Q. Did he argue to the Company that your discharge was improper, unfair, unjust, discriminatory?

A. Yes, he did.

Q. Did he say all of those things?

A. Yes.

Braxton dep. at 61. These arguments were unavailing, and the discharge stood.

According to Mr. Braxton, a second grievance meeting was held, where Mr. Laczo again argued that United Parcel had treated Mr. Braxton unfairly, that termi-

---

**6.** As the Court also pointed out in *Findley*, 639 F.2d at 958, "to hold lay union representatives to the demanding tests applied to a trained trial lawyer would defeat the aims of informality and speedy resolution contemplated by labor-management grievance agreements."

nation was not warranted, but that, at most, some milder form of discipline was called for. Although Mr. Laczo did most of the talking, Mr. Braxton also spoke on his own behalf. Braxton dep. at 63–64. Mr. Braxton added that it was his recollection that Mr. Laczo argued "that he thought that this was taking place because of my activities as a shop steward and that the Company was discriminating against me because of that." Braxton dep. at 64–65. Most pertinent to the present claims against Local 623, at his deposition the following colloquy took place with Mr. Braxton regarding this second meeting:

Q. Did you have any objection to what Mr. Laczo argued to the Company at this meeting?

A. No.

Q. Did you express any disagreement to him about what he said?

A. No, I did not.

Q. Did you express any approval of what he said?

A. I think I said that I thought he'd, you know, he tried to argue for me—yeah, that I thought he did a pretty good job.

Braxton dep. at 65. This second meeting was no more availing for Mr. Braxton than the first.

Under § 2(c) of Article 46 of the Supplemental Agreement, if United Parcel and Local 623 are unable to resolve a grievance, then the matter

shall be submitted in writing within ten (10) working days, unless otherwise mutually agreed to:

(1) The Atlantic Area Parcel Grievance Committee, if it is a grievance relating to this Supplemental Agreement or a matter not relating to the interpretation or application of the Master Agreement or appeal from discharge or suspension.

Local 623 thereupon requested a hearing before the AAPGC on the issue of Mr. Braxton's discharge. Braxton dep. at 66. Section 3 of Article 46 provides, in pertinent part:

(a) Except as otherwise provided for in the Master Agreement, a local area grievance committee shall be established and be known as the Atlantic Area Parcel Grievance Committee.

(b) The Atlantic Area Parcel Grievance Committee ... shall be composed of UPS representatives and Union Representatives.

c) There shall be one (1) representative of UPS or his designee who will serve as Co–Chairman and one (1) representative of the Union or his designee who will serve as Co–Chairman.

As noted earlier, the hearing before the AAPGC was held in Williamsburg, Virginia on January 15, 1991. Mr. Braxton, Mr. Laczo and Local 623 Secretary/Treasurer Richard Opalesky appeared for the union and Mr. Braxton (Braxton dep. at 66–67). In conformity with § 3(f) of Article 46 of the Supplemental Agreement,

It is understood and agreed that the UPS representatives and the Local Union representatives of the AAPGC representing the UPS operation and/or Local Union involved in a proceeding before the panel will be ineligible to act as a member of the panel during the proceeding,

and, thus, no member of Local 623 sat on the union side of the panel, nor did the management representatives come from the Philadelphia area. Braxton dep. at 74–75.

As noted, the transcript of this proceeding is contained in sixty-nine single-spaced pages. A fair reading of these pages demonstrates that not only did Mr. Laczo present Mr. Braxton's case to the panel, but Mr. Braxton himself spoke at great length and without fetter on his own behalf. See pp. 13–19, 21–22 and 33–35 of the AAPGC transcript. At the end of this lengthy proceeding, the Co-chairman from the union side engaged in the following colloquy with Mr. Braxton:

Candler: I have two questions for you. Do you feel you have been given the opportunity today to bring out all the facts pertaining to your discharge?

Braxton: Yes I do.

Candler: Do you feel you have been properly represented by your Local Union?

*Braxton:* Yes I do.

*Candler:* Executive Session.

AAPGC Tr. at 69. Again, United Parcel's discharge was sustained as "just" within the meaning of the Collective Bargaining Agreement. Braxton dep. at 82.

Against the many pages of advocacy on his behalf in the present forum, it is important to pause here to consider Mr. Braxton's repeated contemporaneous expressions of satisfaction with the advocacy of Mr. Laczo at the grievance level and with the process that was extended to him at the AAPGC hearing. His "Yes I do" answers to whether he had "been properly represented by your Local Union" and "Do you feel you have been given an opportunity today to bring out *all* the facts pertaining to your discharge" [emphasis added] must be regarded as those of a highly intelligent, assertive individual. While it is true that Mr. Braxton is not a lawyer, it is unarguable that he is a highly educated, articulate individual who has repeatedly demonstrated the courage of his convictions by the prominence of his work on the TDU's behalf—in short, he cannot in any sense be regarded as a "wilting flower", a proposition with which his counsel "would certainly agree." Tr. of September 11, 1992, oral argument at 30. It is fair, therefore, for us to take Mr. Braxton at his word when we review the claims he makes now in the federal forum.

Mr. Braxton's claim of lack of fair representation leads us merely to his "assumptions" about the bias of the union members of the AAPGC panel, and that Mr. Laczo never did anything about it. In Mr. Braxton's words in his deposition:

Q. Are you alleging in this lawsuit that all three members of the panel were prejudiced against you?

A. Yes, I believe so. At least implicitly.

Braxton dep. at 102. When asked what specific facts he had that particular members of the panel were biased against him, the most Mr. Braxton could say was the following:

A. I believe that the fact that Mr. Hall was appointed by Al Barlow, who I believed to be hostile to me, is evi-

dence that he is—was prone to be prejudiced against me. I believe that, in general, for local Union officers to take a position that to be viewed as favorable to TDU or to Ron Carey would be something that they would view rightly as jeopardizing their position within the Union hierarchy.

*Id.* But when pressed to explain the specific facts supporting this general charge, all Mr. Braxton could add was:

Q. It's your view that all Union officers are against Mr. Carey?

A. No. That's clearly not the case.

Q. But is it your view, then, that all Union officers on the UPS Atlantic Area Parcel Grievance Committee were against Mr. Carey?

A. No. What I said was—or what I tried to say was that I think that for a Union officer to speak up in favor of Mr. Carey is going to put him in disfavor with higher-ups within the Union and therefore is a risky thing for him to do.

Q. Is that the extent of the evidence that you have that Mr. Hall was in some way prejudiced against you because of your advocacies or support of Mr. Carey?

A. That's the extent of the evidence.

*Id.* at 102–103.

When pressed as to what evidence he had that the union members of the AAPGC panel knew anything of his particular TDU activity, Mr. Braxton could only offer an assumption:

A. Well, I assume that they read the International Teamster magazine. One of these lawsuits was discussed in the International Teamster magazine, including mentioning my name in a derogatory manner as one of the plaintiffs.

Q. That's your assumption?

A. Yes. I assume that they read the literature. I know that it's mailed to them, and I assume that they read it.

*Id.* at 104–105.

Later in his deposition, when reporting on his hearsay inquiry about the union

members of the AAPGC, Mr. Braxton conceded that his unnamed informant reported that "Mr. Hall was a fair person" (Braxton dep. at 131) and that Mr. Candler, "as far as the Ron Carey candidacy; that he was—that he was not taking a public position in favor of him, that, to the knowledge of the person that I had spoken to, he had not taken a strong position against him either; ...." Braxton dep. at 130. On the other hand, Mr. Braxton stated that another unnamed local informant told him that Mr. Wood, the third union member of the panel, was "an unreconstructed anti-Carey person." Braxton dep. at 135–136.

Colorful and interesting as these assertions may be as a matter of internal Teamster politics, they are irrelevant to the question of Local 623's "fair representation" of Mr. Braxton. In his deposition, Mr. Braxton admitted that neither he nor Mr. Laczo knew any of the panel members, which is not surprising since they were from North Carolina, South Carolina and West Virginia. Under those circumstances, the Local could not conceivably have participated in loading the panel as to whose composition it had nothing to do and whose identity it had no way of learning before the hearing took place. Even now, Mr. Braxton has not alleged that Mr. Laczo or any member of Local 623 "took a fall" or otherwise did not vigorously pursue his interests. The only claim proffered in this respect is that Mr. Laczo somehow discouraged Mr. Braxton from raising the subject of his TDU activity at the AAPGC proceeding. Mr. Braxton's deposition paints a contrary picture, however:

Q. And what did Mr. Laczo advise you about that?

A. He—he did not really give me specific advice. He said something like I don't know if that's a good idea, but you can bring it up if you want to, something to that effect.

*Id.* at 71.

Against this gentle suggestion—which we can easily picture even a seasoned law-yer giving Mr. Braxton under the circumstances—Mr. Braxton did not feel bashful about raising his own support of Ron Carey. *See* AAPGC Tr. at 19. When Mr. Braxton did raise this, it is true that the Union Co–Chairman stated, in our view properly, that "your political affiliation is not on trial here", *id.*, to which Mr. Braxton replied:

That is correct and I am not trying to bring Carey up, to debate Ron Carey here. I am simply saying that this is part of my union activity.

*Id.*[7] The January 15 transcript is, however, replete with Mr. Laczo's contentions that, as he put it, "The Local Union and John's contention is that UPS has singled John out because of his union activities." AAPGC Tr. at 13.

Thus, against the vaporous assumptions of generalized bias, Mr. Braxton has come forward with no "specific facts" to rebut the Local's repeated instances, as to which Mr. Braxton took no contemporaneous exception, of vigorous advocacy on his behalf.

*Thomas v. United Parcel Service, Inc.*, 890 F.2d 909 (7th Cir.1989), upon which Mr. Braxton places great reliance, is not to the contrary of our conclusion here. *Thomas* involved a case where political opponents from the grievant's local served on the panel and the Seventh Circuit reversed summary judgment because "the district court erred in refusing evidence of union bias in ruling upon the motions for summary judgment." 890 F.2d at 923.

The Seventh Circuit stressed the fact that the grievant's representative, Mr. Falco, "had participated in anti-TDU demonstrations and signed a leaflet opposing a TDU reform proposal." 890 F.2d at 913. Perhaps more significant, the record showed that two of the union officials who sat on the *Thomas* grievance panel had themselves "signed the same anti-TDU leaflet signed by Mr. Falco and that each

---

7. Thus, had Mr. Braxton not on his own identified himself with the Ron Carey faction, there would be no basis at all in this record to conclude that the union members of the AAPGC panel knew of Mr. Braxton's TDU credentials.

Nothing was proffered to us to suggest that the reference in the Teamster magazine "mentioning my name in a derogatory manner" was seen or remembered by any panel member.

had participated in the anti-TDU demonstrations." *Id.* This admissible evidence contrasts with the inadmissible conjecture Mr. Braxton proffers here. Nowhere does he suggest that Mr. Laczo, Mr. Braxton's representative throughout the grievance procedure, had committed any act, or said anything, against either him or the TDU. More significantly, the union members of the AAPGC panel were not members of the same Local as Mr. Braxton, in contrast with the experience in *Thomas.* Indeed, the Supplemental Agreement by its terms forbids members of the Local from serving on AAPGC panels, and here the representatives were from West Virginia and the Carolinas. Thus, whatever the merits of the Seventh Circuit's position in *Thomas,*[8] Mr. Braxton's case is materially distinguishable from it.

Further, Mr. Braxton has, as noted, proffered no "specific facts" within the meaning of Rule 56(e), as the Supreme Court has construed it in *National Wildlife Federation,* that would begin to approach the showing of bias the Court found in *Thomas.*[9] *Thomas* is thus of no assistance to Mr. Braxton here.

We therefore conclude that Local 623 vigorously championed Mr. Braxton's case in connection with his discharge, and therefore fulfilled its duty of fair representation to him.

## 2. The § 411 LMRDA claim.

As his Fourth Count, Mr. Braxton states, in one paragraph,

38. Defendants IBT, Eastern Conference and Local 623 violated plaintiff's rights under the LMRDA, 29 U.S.C. § 411 in that the union defendants discriminated against plaintiff because of his opposition to the incumbent union leadership and to the contract which the union had negotiated with UPS.

Given the generality of this paragraph, Local 623 can be forgiven for not comprehending its thrust until after Mr. Braxton made it clear in his Memorandum in Opposition, at 26–30, that he was asserting his free speech and assembly rights under subsection (a)(2), and the right of a union member to institute civil actions under subsection (a)(4), of § 411. These two sections provide:

(2) Freedom of speech and assembly

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: Provided, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its per-

---

**8.** The analysis of the Seventh Circuit at 890 F.2d at 917–923, dealing with the issue of joint employer-employee panels, is based upon the Seventh Circuit's own jurisprudence, *see* esp. 922–923, as to which we are unaware of any analogue in this Circuit. Further, given the obviously salutary benefits of such panels in maintaining labor peace, we respectfully suggest that the Seventh Circuit's expansive language is unpersuasive and contrary to the desire of Congress and the Supreme Court to promote harmonious employer-union relations through the arbitral mechanism. Not at all parenthetically, the Seventh Circuit's approach appears to be at odds with the Third Circuit's teaching in *Riley,* cited and discussed *supra* at pp. 540–541, that avoids the bog of hearsay bias inquiries that Mr. Braxton invites us to wade into.

**9.** Contrast, for example, the admissions and record cited in *Thomas* with the vaporous affidavit of Mario Perrucci, Exhibit E to plaintiff's Supplemental Memorandum submitted on September 18, 1992. In ¶ 4 Mr. Perrucci states that he "became acquainted with Mr. Al Barlow", who Mr. Braxton says appointed Mr. Hall, a member of the AAPGC panel. By this "acquaintance" of Mr. Barlow, Mr. Braxton asks us to infer—and therefore declare appropriate for a jury's consideration—that (a) Mr. Hall knew of Mr. Braxton and was biased against him and (b) Local 623 could have—should have?—done "something" to prevent it. It was just this sort of "promenade" the Supreme Court has forbidden us to walk.

formance of its legal or contractual obligations.

\* · \* \* \* \* \*

(4) Protection of right to sue

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

■ With respect to the free speech and assembly claim, it is difficult to imagine what, precisely, Mr. Braxton can be asserting against Local 623. Mr. Braxton has cited no actions of the Local that in any way inhibited his free speech and assembly rights as a member of the TDU. To the extent that he alleges that the Local's actions in connection with the grievance procedure also violated his free speech and assembly rights,[10] our disposition of the fair representation claim forecloses any such additional gloss on the Local's behavior in that proceeding. Mr. Braxton has also shown no act of retaliation, or any other adverse act, by Local 623 as punishment for his TDU activity. *See Brenner v. Local 514, United Brotherhood of Carpenters & Joiners*, 927 F.2d 1283, 1297–1299 (3d Cir.1991).

We have carefully examined the record proffered to us, and have found no evidence that any representative of the Local inhibited Mr. Braxton's rights of expression, which the AAPGC transcript demonstrates beyond doubt Mr. Braxton exercised to the fullest.

■ It is equally hard to understand how the Local could have violated Mr. Braxton's rights under § 411(a)(4) to institute civil actions. Notably, Local 623 was not named in any of the three suits in which Mr. Braxton was a litigant.[11] In any event, Mr. Braxton has again proffered no "specific facts" that Local 623 prevented him from participating in either the filed lawsuits, or other ones, and thus his § 411 claim must succumb to Local 623's motion for summary judgment.

B. *United Parcel's Motion*

■ It will be recalled that Mr. Braxton's Fifth Count is the only remaining Count against United Parcel, and asserts that Mr. Braxton was discharged without "just cause" in violation of the Collective Bargaining Agreement. Having held, however, that Mr. Braxton had fair representation from his union, we must give effect to the Collective Bargaining Agreement when it provides, at Article 46 § 3(e), that the decision of the AAPGC "shall be binding on all parties." Indeed, the Supreme Court has held that a member's fair representation claim against his union serves as an "indispensable predicate to his breach of contract action against his employer." *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1564, 67

---

**10.** Of late Mr. Braxton has claimed that Mr. Laczo restrained advocacy about Mr. Braxton's TDU activities at the January 15, 1992 AAPGC proceeding. It will be recalled, however, that Mr. Braxton testified that "He [Mr. Laczo] said something like I don't know if that's a good idea, but you can bring it up if you want to, something to that effect." Braxton dep. at 71. No reading of this suggestion could catapult Mr. Laczo's words into some sort of prior restraint in violation of § 411(a)(2).

**11.** *See* ¶¶ 16 and 17 of the complaint wherein two of these actions are described, and p. 4 of Mr. Braxton's Memorandum in Opposition where a third case is also mentioned, *Patrick, et al. v. McCarthy*, 743 F.Supp. 894 (D.D.C.1990).

L.Ed.2d 732 (1981). Thus, having failed in his fair representation claim, our duty is confined to giving effect to the binding AAPGC decision that upheld the "just cause" for Mr. Braxton's termination.

We thus need not consider United Parcel's alternative argument in order to grant its motion for summary judgment.[12]

### Conclusion

Within the International Brotherhood of Teamsters it cannot be questioned that Mr. Braxton was, prior to Ron Carey's election as its President, an articulate champion of internal union reform. Nothing in the record before us, however, leads to any conclusion other than that his Local championed *his* cause tenaciously and vigorously after his discharge, and thus the Local does not overstate its case when it says "[t]he Union could have done nothing more for plaintiff." [13]

Federal labor law required no more of Local 623 than it gave Mr. Braxton after he was fired, and thus it and Mr. Braxton's former employer are entitled to summary judgment.

---

**12.** At pp. 8–11 of its brief, and in most of its reply brief (pp. 5–9), United Parcel argues that Mr. Braxton should be collaterally estopped by the decision of the Pennsylvania Unemployment Compensation Board of Review Referee's decision that Mr. Braxton could not receive such benefits because he was guilty of "willful misconduct in connection with his work." *See* Exhibit D to United Parcel's motion, Appeal No. 91–1–N–138 (January 25, 1991). United Parcel makes the attractive argument that since the Referee—whose views about the TDU have not been questioned—found that Mr. Braxton had committed "willful misconduct", Mr. Braxton necessarily had to have been fired under the less stringent "just cause" standard of the Collective Bargaining Agreement. While this argument has much to commend it under the general analysis of the Supreme Court in *University of*

*Tennessee v. Elliott,* 478 U.S. 788, 798 n. 6, 106 S.Ct. 3220, 3226 n. 6, 92 L.Ed.2d 635 (1986), our Court of Appeals has, since *Elliott,* cautioned that Pennsylvania law on issue preclusion would not readily accept the natural logic of United Parcel's position. *See Kelley v. TYK Refractories Co.,* 860 F.2d 1188, 1194–1196 (3d Cir. 1988), construing the Pennsylvania Supreme Court's decision in *Odgers v. Commonwealth Unemployment Compensation Bd. of Review,* 514 Pa. 378, 525 A.2d 359 (1987). In light of our holding about the finality of the AAPGC determination of "just cause", we need not parse *Odgers* to see if it would be congenial to the merits of United Parcel's position on this point.

**13.** Local 623's Memorandum of Law at 12.